## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES<br><br>v.<br><br>WILLIAM HICKMAN, *et al*.,<br><br>*Defendants*. | Docket No.:  1:19-cr-191<br><br><br><br>Before: Robert B. Kugler,<br>United States District Judge |

## BRIEF IN SUPPORT OF DEFENDANT BRIAN PUGH'S PRETRIAL MOTIONS

**BALDASSARE & MARA, LLC**
570 Broad St., Suite 900
Newark, New Jersey 07102
(973) 200-4066

*Attorneys for Defendant Brian Pugh*

On the Memorandum:

Michael Baldassare, Esq.
Jennifer Mara, Esq.
Charles Kennedy, Esq.

## <u>TABLE OF CONTENTS</u>

I.     PRELIMINARY STATEMENT .......................................................................... 1

II.    COUNT 1 OF THE INDICTMENT SHOULD BE DISMISSED BECAUSE IT
IMPERMISSIBLY ALLEGES A RIMLESS WHEEL, HUB-AND-SPOKE
CONSPIRACY. ................................................................................................ 7

    A.    Introduction................................................................................... 7

    B.    The Applicable Legal Standard ..................................................... 8

    C.    The Motion Should Be Granted Because Count 1 Charges a Rimless Hub-
and-Spoke Conspiracy. ............................................................... 12

        1.    Introduction...................................................................... 12

        2.    The Indictment does not allege a common goal among the 15 or
more alleged co-conspirators. .................................................... 14

        3.    The Indictment does not allege an agreement that requires the
continued cooperation of the conspirators to bring about success
for all. .............................................................................. 17

        4.    The Indictment does not allege an overlap of personnel. ....................... 20

III.   COUNTS 9 THROUGH 13 SHOULD BE DISMISSED BECAUSE THEY DO
NOT ALLEGE A SINGLE FRAUDULENT STATEMENT OR
MISREPRESENTATION................................................................................ 23

    A.    Introduction................................................................................. 23

    B.    The Applicable Legal Standard ................................................... 23

    C.    The Motion Should Be Granted Because Counts 9 Through 13 Fail To
Allege A Material Misrepresentation............................................ 25

IV.   COUNT 28 SHOULD BE DISMISSED BECAUSE IT FAILS TO ALLEGE A
SINGLE CONSPIRACY. ............................................................................... 29

    A.    Introduction................................................................................. 29

    B.    The Applicable Legal Standard ................................................... 29

    C.    The Motion Should Be Granted Because Count 28 Suffers From Similar
Deficiencies As Count 1. ............................................................ 29

V.    COUNTS 37, 38, 49 & 50 SHOULD BE DISMISSED BECAUSE THEY
CHARGE MR. PUGH WITH AN OFFENSE THAT IS NOT COGNIZABLE AT
LAW. ............................................................................................................ 31

    A.    Introduction................................................................................. 31

    B.    The Applicable Legal Standard ................................................... 31

    C.    The Motion Should Be Granted........................................................ 32

VI.   THE GOVERNMENT MUST PROVIDE A BILL OF PARTICULARS. ..................... 35

A.     Introduction .................................................................................. 35

B.     The Applicable Legal Standard ................................................... 35

C.     The Court Should Grant This Motion. .......................................... 39

    1.     False/Fraudulent Representations ............................... 39

    2.     The Indictment only identifies one of several alleged recruits. .............. 41

    3.     People Who Allegedly Paid Dr. Gaffney .................................... 43

    4.     The Preparation And Faxing Of Prescription Forms From Doctors' Offices. ................................................................ 44

    5.     Medical Terminology That Is Not Defined By Statute Or In The Indictment. ................................................................ 47

    6.     Other Facts Appropriate For Disclosure Pursuant to Rule 7(f). .............. 49

    7.     The Unidentified Unindicted Co-Conspirators ........................... 49

VII.     THE COURT SHOULD SEVER MR. PUGH'S CASE PURSUANT TO RULE 14. ................................................................ 52

    1.     Applicable Legal Standard ....................................... 52

    2.     The Motion Should Be Granted. ................................ 52

VIII.    THE COURT SHOULD ORDER THE PRODUCTION OF A VERY LIMITED PORTION OF THE GRAND JURY TRANSCRIPTS. ................................. 56

A.     Introduction .................................................................................. 56

B.     The Applicable Legal Standard ................................................... 56

C.     The Motion Should Be Granted. ................................................. 58

IX.     THIS CASE SHOULD BE TRANSFERRED TO THE NEWARK VICINAGE FOR TRIAL DUE TO PREJUDICIAL PRETRIAL PUBLICITY. ................................. 61

A.     Introduction .................................................................................. 61

B.     The Applicable Legal Standard ................................................... 61

C.     The Motion Should Be Granted ................................................... 61

    1.     The Size And Characteristics Of The Community In Which The Crime Occurred. ................................................................ 61

    2.     The Nature Of The News Stories ................................ 62

    3.     The Timing Of The Trial In Relation To The Alleged Crime ................ 64

X.     CONCLUSION .................................................................................. 66

## I.     PRELIMINARY STATEMENT

Defendant Brian Pugh submits this brief in support of his pretrial motions.  For several years now, the government has leveraged the uneven playing field of the federal criminal justice system to procure a steady stream of guilty pleas in compounding pharmacy cases from individuals who, for a variety of reasons unrelated to Mr. Pugh, were either unable or otherwise disinclined to put the government to its proofs.  District Court Judges have seen a steady parade of public servants with no medical background go under oath and say anything to resolve their cases, such as swearing that a prescription had "no medical necessity," a determination that those individuals (like the U.S. Attorney's Office) have no business making.

The government's sprawling and novel theories of criminality have yet to survive comprehensive legal (let alone factual) challenges, *e.g.*, the notion that institutional parties charged with protecting people made tens of millions of dollars are viewed as "victims" even though it is impossible that they were not part of any fraud if one was committed, a case in which teachers and decorated police and fire fighters are carted off to federal prison for obtaining sums of money that, in all honesty, federal prosecutors should be embarrassed about chasing and that, in a State prosecution, would result in presumptively probationary sentences.  And, with the exception of one contested sentencing hearing, the government has never had to justify the manner in which it theorizes this umbrella of criminality that it contends overtook the southern tip of New Jersey for two years.

Into that morass of capitulation and submission, the government has tried to dump Brian Pugh, a successful local businessman with no criminal history.  That the Indictment alleges nothing resembling direct evidence against Mr. Pugh gives the government no pause because, up to the filing of these motions, it has been proceeding unimpeded.  That is why, for example, Count 1 charges a conspiracy with at least 15 individuals in the hopes that Brian Pugh will never be judged *based on the evidence against him*, that he will be portered through this process as part of a group and led to a wrongful and unjust finding of guilt by association, confusion and questionable evidence.  When the government levies such a charge, the Supreme Court has

cautioned that steps must be taken to "safeguard each defendant individually, as far as possible, from loss of identity in the mass." *Kotteakos v. United States*, 328 U.S. 750, 776 (1946).

The lack of any accountability or challenge for the past several years is why the government is content to base the allegations against Mr. Pugh on "others" in numerous contexts: "other" unindicted co-conspirators, "other" doctors, "other" patients, "other" benefits, and "other" property.



That is why Mr. Pugh is not accused of <u>doing</u> anything, but only of <u>causing</u> something to happen. We are never told <u>how</u> he caused it and usually he is only accused of causing it with someone else, thereby adding a layer of opacity to the accusation (while simultaneously revealing the government's inability to even put details in the Indictment, a document resulting from the most one-sided proceeding known to the law).

*<u>To be sure, these pretrial motions are exclusively focused on legal issues.</u>* Yet the manner in which the Indictment has articulated the charges against Mr. Pugh reveals the government's strategy regarding him and, therefore, the preceding discussion was necessary. With that said, Mr. Pugh provides the following summary of his pretrial motions.

In Point II, Mr. Pugh moves to dismiss Count 1, which charges a conspiracy to commit health care fraud and wire fraud, in violation of 18 U.S.C. § 1349. Count 1 should be dismissed

because it charges multiple conspiracies in one count, something that is precluded under well-settled legal principles.  Drafted and charged in an overbroad and legally insufficient manner that characterizes much of the Indictment, Count 1 charges all seven Defendants, six unindicted co-conspirators and at least two unnamed unindicted co-conspirators, bringing the grand total of individuals allegedly involved to 15.   Interestingly, the plain language of the Indictment repeatedly describes the charges in terms of three separate and distinctly operating alleged conspiracies, each of which emanates like "spokes" from the central "hub" (of the Hickmans and Dr. Gaffney).  Those spokes could colloquially be called the Tedesco/Broccoli Spoke, the Sher Spoke and the Pugh/Schallus Spoke.  Based solely on the words in the Indictment, it is clear that the Indictment charges the following three conspiracies, rather than any single agreement to violate the law:



When measured against the applicable legal standard, which has been well-settled for over 70 years, it is clear that Count 1 cannot stand and should be dismissed.

In Point III, Mr. Pugh moves to dismiss Counts 9 through 13, which charge (along with Defendants Hickman and Schallus) him with health care fraud, in violation of 18 U.S.C. § 1347.  These counts fail because they do not allege a single material misrepresentation that Mr. Pugh allegedly made.

In Point IV, Mr. Pugh moves to dismiss Count 28 which charges him (along with the Hickmans) with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). That Count is facially invalid because it suffers from precisely the same, and an even more significant legal deficiencies than the conspiracy charged in Count 1. That is, there are several conspiracies lumped into one count. All of Mr. Pugh's arguments regarding Count 1 are applicable to Count 28. Moreover, Count 28 alleges absolutely no facts to support the charged conspiracy to commit money laundering. There is not one single allegation in Count 28, in any of the realleged paragraphs or, for that matter, anywhere in the Indictment to support the facial validity of a charge that Brian Pugh conspired with the Hickmans to launder money, let alone that he agreed to do so by sending money to unnamed people's wives and companies (none of whom or which are identified). The law does not support pooling defendants, spouses, unnamed others, checks, companies and so on, calling it a "conspiracy" and charging it as money laundering. For this reason, and others detailed herein, the conspiracy in Count 28 (as well as the corresponding substantive Counts) should be dismissed.

In Point V, Mr. Pugh moves to dismiss Counts 37, 38, 49 and 50 which charge him – and him alone – with substantive money laundering, in violation of 18 U.S.C. § 1957 and with aiding and abetting that offense, 18 U.S.C. § 2. Those Counts are facially invalid for a simple a straightforward reason: they charge Brian Pugh with a crime that does not exist. He is charged with aiding and abetting himself. Yet again, in the government's zeal to continue with this case against Mr. Pugh – with an Indictment that on the one hand accuses him of the attenuated crime of "causing" things (sort of) with others – he is now charged with a super-personal offense, helping himself. Had the government not been tested by these Motions, this tactic would have gone undetected. The case law is clear. Counts 37, 38, 49 and 50 are facially invalid and cannot stand.

In Point VI, Mr. Pugh seeks a bill of particulars on a number of critical topics.  At the risk of putting too fine a point on it:  *this is not a standard bill of particulars motion that addresses the government's overuse of "others" and "elsewhere."*  Quite to the contrary, rarely in the collective experience of defense counsel has there been an Indictment that deployed vagaries to such depths and ends.  There are "other" unnamed unindicted co-conspirators, "other" doctors, "other" patients and "other" recruiters.  *In the end, for all the purported detail, the Indictment really provides Mr. Pugh with very few particulars about the offenses for which the government will seek to take his liberty.*  The law does not permit that result.  The government sought this Indictment.  These are the words in the Indictment.  These are facts alleged in the Indictment.  The case law is well-settled and clear.  Mr. Pugh is entitled to information and he has taken great pains to detail the precise categories for the Court so that an appropriate Order can be fashioned well in advance of trial.  This motion is non-controversial and should be granted.

In Point VII, Mr. Pugh moves for a severance pursuant to Rule 14.  Given the manner in which the Indictment is pled and how the government seeks to present this case as "guilt by association," the need for a severance is straightforward.  *Basically, the real standard for becoming a co-Defendant in this Indictment is simple:  reject a plea offer.*  That is the only explanation for Brian Pugh's presence in an Indictment with Christopher Broccoli and most of the others, including the unindicted co-conspirators, their wives, their unnamed wives, the companies set up by their unnamed wives and even more people who are unnamed and uncategorized.  Mr. Pugh should stand or fall based upon the government's ability to prove, (or not prove) its case against *him*, no one else.

In Point VIII, Mr. Pugh moves for the production of a limited portion of the grand jury transcripts pursuant to Rule 6.  Given the deficiencies in this Indictment, it is clear that the grand jury was not instructed properly and that other serious errors were made to an extent that Mr. Pugh was deprived of his rights under the Fifth Amendment's Grand Jury Clause.  There is more

than an ample record for the Court to reach that conclusion.  For example, Mr. Pugh is charged with aiding and abiding himself.

In Point IX, Mr. Pugh seeks a transfer of this matter to the Newark vicinage for trial due, in part, to the pretrial publicity caused by the FBI simply so it could obtain a "perp walk" and some positive press that continues to haunt the Defendants to this day.  The circumstances of that press coverage are highly problematic because they implicate grand jury secrecy, the FBI's refusal to accommodate Defendants so that there was maximum exposure for the agency (even though it flouted policy), and allowed for substantial media exposure.  Defense counsel contacted the FBI and the U.S. Attorney's Office with a detailed and documented joint submission, requesting relief and assistance.  Both offices ignored the request and never responded in any fashion.  This Court should not act the same way.  For reasons beyond even the FBI's actions, the local press associated with this matter warrants a transfer to the Newark vicinage for trial.

*       *       *       *

Ultimately, Mr. Pugh's precarious position as a criminal defendant seeking nothing more than to be judged on his own merit warrants continued vigilance regarding the Supreme Court's admonition in *Kotteakos*, 328 U.S. at 772:

> Guilt with us remains individual and personal, even as respects conspiracies.  It is not a matter of mass application.

Thus, Brian Pugh, an individual in the eyes of the law (as opposed to part of the government's collected mass) submits this brief and joins in the motions of his co-Defendants to the extent their positions are consistent with his interests and the relief sought herein.

## II.   COUNT 1 OF THE INDICTMENT SHOULD BE DISMISSED BECAUSE IT IMPERMISSIBLY ALLEGES A RIMLESS WHEEL, HUB-AND-SPOKE CONSPIRACY.

### A.   <u>Introduction</u>

Court 1 purports to allege a single vast conspiracy involving all seven Defendants, six unindicted co-conspirators and at least two "other" unnamed (presumably unindicted) co-conspirators. The government drafted Count 1 artfully, frequently grouping all seven Defendants together in a single Count in the hopes that those scrivener decisions would have the force of law regarding joinder and establish a properly pled single conspiracy. *See, e.g.*, Ind. ¶ 8.

A close reading of the Indictment demonstrates that, quite to the contrary of the government's goal, Count 1 alleges at least three independent free-standing conspiracies, each stemming from the Hickmans and Dr. Gaffney in a classic "hub" and "spoke" style. Count 1 repeatedly alleged the following formation:



Ind. at ¶ 8.

As this Court knows, a hub-and-spoke conspiracy is not a viable criminal charge *unless there is a rim joining the all the spokes together*, thereby merging the myriad schemes into one. *Without the rim*, there is no agreement; *without the rim*, there is no *mens rea* that warrants criminal, rather than civil, penalties; *without the rim*, there is nothing upon which a jury may reach constitutionally valid unanimity; *without the rim*, a defendant is deprived of constitutional protections regarding the quantum and quality of evidence that the government must produce before his liberty can be taken. *See, e.g.*, *Kotteakos v. United States*, 328 U.S. 750, 769-74 (1946) (reversing convictions in a case where the government attempted "to string together, for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all"); *United States v. Camiel*, 689 F.2d 31, 38 (3d Cir. 1982) (affirming the district court's determination "that the evidence of multiplicitous schemes worked a prejudice to the substantial rights of the defendants" because the jury might have been unable to separate offender and offenses, thus transferring guilt from one defendant to another).   Under the well-settled and prevailing legal standard, Count 1 fails to allege a rim and, therefore, neither Mr. Pugh nor his co-Defendants have been properly joined in Count 1.   For that reason, Count 1 should be dismissed.  *See* Fed. R. Crim. P. 8(b); 12(b)(3)(B)(v).

### B.      The Applicable Legal Standard

The Fifth Amendment to the United States Constitution guarantees that an individual may only be brought to trial for a crime if indicted by a grand jury.  U.S. Const. amend. V.  Moreover, the Sixth Amendment guarantees that a defendant shall be "informed of the nature and cause" of the charges against him, *cf. Russell v. United States*, 369 U.S. 749, 761-63 (1962), a requirement that is effectuated by Federal Rule of Criminal Procedure 7, which states that an indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense ...."  Fed. R. Crim. P. 7(c)(1).  *See also Hamling v. United States*, 418 U.S. 87, 117

(1974) (indictment should "'set forth all the elements necessary to constitute the offence intended to be punished'") (quoting *United States v. Carll*, 105 U.S. 611, 612 (1882)).  Given the constitutional underpinnings of Rule 7, it is viewed as embodying "basic principles of fundamental fairness[,]" *Russell*, 369 U.S. at 765.  Indeed, "'the substantial safeguards to those charged with serious crimes [regarding the requirement that a crime be pleaded] cannot be eradicated under the guise of technical departures from the rules.'"  *Id.* (quoting *Smith v. United States*, 360 U.S. 1, 9 (1959)).  *See also United States v. Goldstein*, 502 F.2d 526, 530 (3d Cir. 1974) (reversing denial of motion for judgment for acquittal because difference between dates in the indictment was "not a mere formality or an innocuous difference of unimportant data but [was], rather, a matter of substance").  For example, even an extensive bill of particulars cannot save a facially invalid indictment.  *Russell*, 369 U.S. at 770-71.

Based upon the protections afforded by the Fifth and Sixth Amendments and Rule 7, indictments are held to certain standards.  Specifically, "[i]n order to be valid, an indictment must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating."  *United States v. Hedaithy*, 392 F.3d 580, 589 (3d Cir. 2004) (citing *United States v. Zauber*, 857 F.2d 137, 144 (3d Cir. 1988)).  If an indictment fails to state an offense, it must be dismissed.  *See* Fed. R. Crim. P. 12(b)(3)(B) (authorizing district courts to hear a motion to dismiss an indictment for failure to state an offense at any time during the pendency of the matter); *United States v. Panarella*, 277 F.3d 678, 683-85 (3d Cir. 2002) (holding that indictment should be dismissed if it fails to state an offense because the specific facts alleged fall beyond the scope of the relevant criminal statute); *United States v. Adkinson*, 135 F.3d 1363, 1373 (11th Cir. 1998) (reversing convictions because the indictment alleged conduct that was not a crime under the prevailing law).  For the reasons discussed herein, Count 1 should be dismissed in its entirety.

Mr. Pugh embraces the fact that for purposes of this motion to dismiss, the Court must accept all the allegations as true and that the Court is limited to the four corners of the Indictment. *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007). Indeed, it is precisely those limitations that box the government in and demonstrate why – however creatively formatted – Count 1 fails to allege a single conspiracy.

The Third Circuit applies a "three-step inquiry to determine whether a series of events constitutes a single conspiracy or separate and unrelated conspiracies." *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1989) (citing *United States v. DeVarona*, 872 F.2d 114, 118 (5th Cir. 1989)). The Court instructed district courts to conduct the analysis as follows:

- First, "examine whether there was a common goal among the conspirators." *Id.* (citing *DeVarona,* 872 F.2d at 118).

- Second, "look at the nature of the scheme to determine whether 'the agreement contemplated bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators …." *Id.* (citing *DeVarona,* 872 F.2d at 119 (quoting *United States v. Perez*, 489 F.2d 51, 62 (5th Cir.1973)).

- Third, "examine the extent to which the participants overlap in the various dealings."

*See, e.g.*, *United States v. Kemp*, 500 F.3d 257, 287-91 (3d Cir. 2007) (applying *Kelly* to find that there was a variance between the charged conspiracy and the proof at trial.). *Cf. United States v. Rigas*, 605 F.3d 194, 213-14 (3d Cir. 2010) (considering the *Kelly* factors as well as additional factors including location, temporal overlap, overlap of personnel between conspiracies and determining that the prosecution impermissibly split one conspiracy into multiple prosecutions).

Given the clarity and consistency with which the Third Circuit has spoken it is not surprising that in this Circuit, and elsewhere, federal courts do not abide the "tactic of charging

-10-

many defendants with a single massive conspiracy[.]" *United States v. Evans*, 970 F.2d 663, 674 (10th Cir. 1992). The reason is clear and comes from the Supreme Court:

> The dangers of transference of guilt from one to another, across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place.

*Kotteakos*, 328 U.S. at 774. "The trial judge held that the evidence of multiplicitous schemes worked a prejudice to the substantial rights of the defendants because, even if there had been sufficient evidence to convict any one of the defendants on a single scheme, the volume and manner of presentation of the evidence created the likelihood of spillover: *i.e.*, that the jury might have been unable to separate offenders and offenses and easily could have transferred the guilt from one alleged co-schemer to another. We hold that the trial judge did not err in applying this legal precept, that the second prong of the two-part *Kotteakos* test is satisfied, and, therefore, that reversal of the jury by the district court judge was proper." *United States v. Camiel*, 689 F.2d at 38.

The Court's decision in *Camiel* is not an outlier. *See, e.g.*, *United States v. Pearlstein*, 576 F.2d 531, 544 (3d Cir. 2004) (reversing convictions for salesmen charged with a scheme to defraud, the Third Circuit reasoned the independent misrepresentations by the salesmen did not support a conspiracy because there was no proof the salesmen knew of the purpose of the overall scheme); *United States v. Varelli*, 407 F.2d 735, 743-44 (7th Cir. 1969) (reversing convictions for conspiracy involving two hijackings because while some defendants participated in both schemes, there was no common purpose as each hijacking had a single purpose); *United States v. Eury*, Nos. 1:14-CR-39–1, 1:14-CR-39–5, 2015 WL 1861807, *1 (M.D.N.C. April 23, 2015); (dismissing charge of conspiracy to defraud the United States where indictment reflected at least two distinct agreements, separated in time and by actors, methods, and goals); *United States v. Jackson*, 926 F. Supp. 2d 691, 706 (D.N.C. 2013) (dismissing conspiracy charge against two

-11-

defendants); *Munoz-Franco*, 986 F. Supp. 70, 71-72 (D.P.R. 1997) (dismissing two conspiracy counts charging multiple defendants with conspiracy to commit three different offenses against the United States, because each count actually alleged within it "at least two conspiracies," or two "wholly separate alleged scheme[s]," as evidenced by the fact that the indictment's "description of the overt acts [for one of the conspiracy counts] [was] neatly divided between two distinct sets of co-conspirators").

### C. The Motion Should Be Granted Because Count 1 Charges a Rimless Hub-and-Spoke Conspiracy.

#### 1. Introduction

"The tactic of charging many defendants with a single massive conspiracy is fraught with the potential for abuse." *United States v. Evans*, 970 F.2d at 674.  Indeed, given that this strategy can warp numerous protections, such as jury unanimity, and mandates regarding the quantum and quality of proofs, charging multiple conspiracies in a single count can lead to an "error of constitutional proportions." *United States v. Chandler*, 388 F.3d 796, 808 (11th Cir. 2004).  One way in which a single conspiracy may present such a danger is by charging a rimless wheel conspiracy.  The need for a rim to join the spokes into a wheel of criminality is essential.  As the Court noted in *Chandler*:

> where the "spokes" of a conspiracy have no knowledge of or connection with any other, dealing independently with the hub conspirator, there is not a single conspiracy, but rather as many conspiracies as there are spokes.

388 F.3d at 807 (citing *Kotteakos*, 328 U.S. at 754-55).

It is beyond dispute that Count 1 details and charges a rimless, hub-and-spoke conspiracy rather than a single 15-person conspiracy.  Here, the Court need look no further than the Eleventh Circuit's decision in *Chandler*:

> Jacobson's scheme was a classic "hub-and-spoke" conspiracy, in which a central core of conspirators **recruits** separate groups of co-

> conspirators to carry out the various functions of the illegal
> enterprise. *See Kotteakos v. United States,* 328 U.S. 750, 755
> (1946); *United States v. Perez,* 489 F.2d 51, 58 (5th Cir.1973). In
> such a conspiracy, the core conspirators are the hub and each group
> of co-conspirators form a spoke leading out from the center in
> different directions. *Kotteakos,* 328 U.S. at 755, 66. The core
> conspirators move from spoke to spoke, directing the functions of
> the conspiracy. *Id.*

*Chandler*, 388 F.3d at 807 (emphasis added).[1]

    *Chandler*'s description of a rimless, hub-and-spoke conspiracy matches the four corners of the Indictment perfectly, right down to the use of the function and use of the word "recruits," the fact that was a central core of more than one alleged conspirator (here it is alleged to be the Hickmans and Dr. Gaffney),[2] and the analogous description of how it is claimed that William Hickman and Dr. Gaffney would "move from spoke to spoke[.]"  *Id.*  According to the plain terms of the Indictment, Hickman dealt with Mr. Pugh/Mr.Schallus for a series of transactions; with the three Sher brothers for a series of other transactions; and Mr. Tedesco/Mr. Broccoli for yet a third series of transactions.

    As alleged in the Indictment, the Hickmans recruited certain of the Defendants and unindicted co-conspirators, who each then recruited others, forming independent spokes of the alleged conspiracy.  Specifically, Paragraph Eight alleges the formation of three distinct spokes in the alleged rimless wheel conspiracy:  (1) the Brian Pugh/Thomas Schallus spoke; (2) the Michael Sher/Thomas Sher/John Sher spoke; and (3) Matthew Tedesco/Christopher Broccoli spoke.  Indeed, the very structure of the sentence comprising Paragraph Eight reflects this structure of the alleged conspiracy.  Because these spokes of the alleged conspiracy "have no knowledge of or connection with any other, dealing independently with the hub conspirator[s],

---

[1] The Third Circuit repeatedly relied upon *Chandler* in *Kemp*, 500 F.3d at 288-90, in finding that the Indictment charged and the government proved a rimless hub-and-spoke, rather than one overarching, conspiracy.

[2] *See also Kemp*, 500 F.3d at 291 (stating that "it is of no moment that the hub of this conspiracy involved two individuals instead of one ….  [T]he inquiry must focus not on the number of individuals who make up the hub, but on the character of the agreements between the spokes").

there is not a single conspiracy," *Chandler*, 388 F.3d at 807, and, therefore, Count 1 should be dismissed.

As more allegations from Count 1 are layered onto the Rimless Wheel Diagram, *supra*, it becomes all the more apparent – in graphic detail – that Count 1 charges multiple conspiracies and presents precisely the virtually presumptive prejudice recognized in *Kotteakos*: "The dangers of transference of guilt from one to another, across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place." *Kotteakos*, 328 U.S. at 774.

> 2.  The Indictment does not allege a common goal among the 15 or more alleged co-conspirators.

Regarding a "common goal" among the alleged co-conspirators, Count 1 alleges one only in the broadest of terms, *i.e.*, that the alleged co-conspirators "sought to enrich themselves by the submission of false and fraudulent insurance claims." Ind. ¶ 4. This purported goal is similar to the common goal that was alleged in *Kotteakos* – to get money by violating the law – which the Court found to be inadequate. Moreover, Count 1's allegation that all seven Defendants sought to enrich themselves in the same way is not sufficient, as a matter of law, to satisfy this legal analysis. According to the Third Circuit:

> although each of these alleged spoke conspiracies had the same goal, there was no evidence that this was a *common* goal

*Kemp*, 500 F.3d at 288 (quoting *Chandler*, 388 F.3d at 811 (emphasis in original)).

Indeed, *Kemp*'s analysis regarding "interdependence" provides clear guidance and establishes that Count 1 alleges multiple conspiracies devoid of an agreed upon common goal, an "agreement" as that term is used in this criminal law setting:

> In evaluating interdependence, we consider how helpful one individual's contribution is to another's goals. *See United States v. Macchia*, 35 F.3d 662, 671 (2d Cir.1994) (describing inquiry as "the extent to which the success or failure of one conspiracy is independent of a corresponding success or failure by the other").

-14-

> We reiterate that interdependence serves as "evidence of an agreement," *Perez*, 280 F.3d at 346; that is, it helps establish whether the alleged coconspirators are "all committed to the same set of objectives in a single conspiracy," *United States v. Smith*, 82 F.3d 1261, 1271 (3d Cir.1996).

*Kemp*, 500 F.3d at 289. The Court provided interdependent examples of the drug smugglers/dealers. *United States v. Perez*, 280 F.3d at 347; *United States v. Portela*, 167 F.3d 687, 697 (1st Cir. 1999); *United States v. Evans*, 970 F.2d 663, 670 (10th Cir. 1992).

Significantly, in *Kemp*, the Court reviewed instances where, as here, one spoke gained nothing from the activities of another. The Court stated in *Kemp*:

> we concluded that there was no interdependence between two kickback schemes because "[t]he co-conspirators in each state derived no benefit, financial or otherwise, from Smith's activities in the other state, nor was the success of the conspiracy in one state contingent on the success of the conspiracy in the other."

500 F.3d at 290 (quoting *Smith*, 82 F.3d at 1271). The Court relied on its decision in *United States v. Camiel*, 689 F.2d 31 (3d Cir.1982):

> we found that the government had failed to prove a common, unified scheme between the officials of both houses of the Pennsylvania General Assembly in offering "no-show" patronage positions, because while each body did offer such positions, "there was a dearth of evidence presented that could link the relevant activities of the two legislative bodies."

500 F.3d 290 (quoting *Camiel*, 689 F.2d at 37). And the Court agreed with the reasoning of the Eleventh Circuit in *United States v. Chandler*:

> In this case, there was no such interdependence of the spokes. The combined efforts of the spokes were not required to insure the success of the venture. No spoke depended upon, was aided by, or had any interest in the success of the others. Each spoke acted independently and was an end unto itself. The actions of one spoke did not facilitate the endeavors of other coconspirators or the venture as a whole.

*Kemp*, 500 F.3d at 290 (quoting *Chandler*, 388 F.3d at 811-12). Applying the principles of all those cases, the Third Circuit found that because defendants Holck and Umbrell did not join the

same conspiracy as defendants White, Kemp and Knight because Holck and Umbrell did not benefit financially from the actions of the latter three.  *Id.*

So too is the case here where the Indictment alleges very clear lines regarding the manner in which the money would flow:

> Brian Pugh secured the agreement of defendant Thomas Schallus and others, in exchange for a share of the amount that defendant Brian Pugh received for the prescriptions, to recruit individuals to agree to obtain prescriptions.

Ind. ¶ 8.  The same allegation is made for the other Defendants, substituting in the names of the individuals for their spoke.  Moreover, Paragraph Nine is just as clear:

> It was further part of the conspiracy that defendants SARA HICKMAN and WILLIAM HICKMAN, through Boardwalk Medical LLC, paid, directly or indirectly, a percentage of the amounts received from Compounding Pharmacy to defendants BRIAN PUGH, THOMAS SCHALLUS, JOHN SHER, THOMAS SHER, and CHRISTOPHER BROCCOLI and co-conspirators Judd Holt, Michael Sher, Matthew Tedesco, Steven Urbanski, Richard Zappala, and others **for the prescriptions that they and their recruiters obtained.**

Ind. ¶ 9 (emphasis added).  Thus, it is worth noting that, as the Court did in *Kemp* when it found that a purported single conspiracy was in fact a rimless hub-and-spoke conspiracy, the financial transactions of the Defendants and spokes alleged in Count 1 functioned independently of each other.  *Kemp*, 500 F.3d at 289 (observing that as for the defendants in *Chandler*, "each of their redemptions was complete until itself.").  *See also Rigas*, 605 F.3d at 214 (noting that the common goal was "enriching the Rigases through the plunder of Adelphia.").

Other than Mr. Schallus (who is admittedly alleged to be part of the same spoke) there is no allegation, as needed to help close the wheel on these hub-and-spoke allegations, that Mr. Pugh was "helpful" to "another's goals."  *Kemp*, 500 F.3d at 289.  Other than Mr. Schallus, there is no allegation that Mr. Pugh profited from the activities of anyone.  There is, for example, no allegation that Mr. Pugh profited from the activities of any other co-Defendant (except the two in

-16-

his spoke, Hickman and Schallus), any unindicted co-conspirator, any unnamed unindicted co-conspirator, any of the companies named in the Indictment (some of which are identified but which never show up on the allegations), any of the "others" who permeate the Indictment, *see infra*, or even people such as the *unnamed* wife of *unindicted* co-conspirator Richard Zappala.[3]

There is no allegation that the success of anyone was "contingent on the success of the" actions of another, *Smith*, 82 F.3d at 1271, (save those within their own spoke). Nowhere is it alleged that Mr. Pugh or Ms. Schallus would succeed or fail based upon what Mr. Broccoli did, or vice versa. *See Kemp*, 500 F.3d at 289 (collecting and citing cases). There is no allegation of a "corresponding success or failure" among the co-conspirators. *Kemp,* 500 F.3d at 289 (citing *United States v. Macchia,* 35 F.3d 662, 671 (2d Cir. 1994)). For all these reasons, and just as the government failed in *Kemp*, Count 1 fails to allege a complete wheel conspiracy and it should, therefore, be dismissed on this basis alone

> 3. The Indictment does not allege an agreement that requires the continued cooperation of the conspirators to bring about success for all.

Count 1 alleges at least three independent conspiracies (perhaps more once the "others" are filled in pursuant to the bill of particulars requested, *see* Section VI, *infra*). Here, the Court should consider the difference between the freestanding agreements alleged throughout Count 1 from those evaluated in *Blumenthal v. United States*, 332 U.S. 539 (1947), in which the co-conspirators needed each other to obtain whiskey and sell it at prices higher than permitted by law. The Court – distinguishing the facts from *Kotteakos* – noted that "the several agreements were essential and integral steps." *Id.* at 558. In *United States v. DeVarona*, , the Court provided the example of a cocaine supplier, importer, distributer and dealer as a single conspiracy in

---

[3] The mysterious Ms. Zappala purportedly founded KLZ Health and Beauty, LLC. Ind. ¶ 1(o). Tellingly on the point of multiple conspiracies, the only allegations related to KLZ relate to the Hickman Defendants and to a timeframe well after any made against Mr. Pugh with the exception of one stray allegation related to a bank deposit.

which each conspirator played a necessary part to the success of the criminal endeavor.  872 F.2d at 118-19.

In this case, no spoke needed any other.  In fact, the allegations – if proven – would show that each spoke operated fine on its own.  Consider, for example, that:

- the Sher spoke allegedly involves overt acts from April-December 2015, with three firefighters in Margate, New Jersey, a company called MBC Distributions LLC, and overt acts committed by Defendants Hickman and either John or Thomas Sher involving people identified as Individuals 17 through 27. According to the allegations in the Indictment, all the revenue from this activity, *i.e.*, all the money that came from achieving the goal of this spoke, went to the Sher brothers, Hickman and Gaffney.  There is no mention of any of the other Defendants.

- the Broccoli spoke (more accurately the Tedesco spoke) involves overt acts limited to August and September 2015, for Defendants Hickman and Broccoli, a firefighter from Camden, New Jersey, related to Individuals 4 through 8.  This spoke allegedly involves Tedesco's company, Lakeside Medical, LLC.  Again, according to the Count 1 – and the balance of the Indictment, for that matter – the money stayed in this spoke.

- the Pugh spoke is limited to *a single month*, October 2015, save one claim regarding November 2015; thus, the Pugh allegations here post-date the Broccoli spoke.  This spoke's alleged overt acts are related to Defendants Hickman, Pugh and Schallus (a police officer in Ventnor, New Jersey), regarding Individuals 10 through 16.  This spoke alleges involvement by a company called BP Med 1 LLC. The allegations are that the money earned here flowed up and through this spoke.

-18-

When this information is added to the Rimless Wheel Conspiracy Chart, it becomes clear just how distinct and independent each spoke is alleged to have operated:



Thus, as alleged, each one of these spokes operated without the need for, help from or interaction with any other. There is no overlap in overt acts or Individuals. The timeframes vary. The money remained in each spoke. As alleged, and unlike a drug distribution network, in which the loss of a speedboat could thwart the goal of the entire conspiracy, *DeVarona,* 872 F.2d at 118-19, any one of these spokes could have operated independently to reach its goal of making money through false insurance claims without the existence of the other spokes, plain and simple. That is the essence of an insufficient, and rimless wheel conspiracy.

In *Kotteakos*, the Court spoke to the very situation alleged in Count 1:

> When many conspire, they invite mass trial by their conduct ....
> Wholly different is it with those who join together with only a few,
> though many others may be doing the same and though some of
> them may line up with more than one group.

328 U.S. at 773. Thus. based upon the independent and disparate claims made about each of the alleged spokes, Count 1 fails under *Kelly* factor two and it should be dismissed.

-19-

4.      The Indictment does not allege an overlap of personnel.

Count 1 does not allege an overlap of personnel to close the hub and spokes into a wheel of crime.   The Third Circuit has been clear that the government cannot establish an overlap among the conspirators simply by alleging – or, for that matter even by *proving at trial* – that the hub defendants (here, the Hickmans and Dr. Gaffney) interacted with each of the spokes.   In *Kemp*, the Third Circuit made that point clearly and unequivocally:

> the government claims that the conspirators overlapped because "White [a lawyer and bank board member] and Kemp [a city official], the core conspirators, dealt with every one of the coconspirators, including Holck and Umbrell, both individually and together." However, this could be said for any hub-and-spokes style conspiracy; *Kotteakos* and its progeny make clear that there must be overlap among the spokes, not just between the hub and the various spokes.

500 F.3d at 291.

Moreover, the fact that the Indictment alleged a hub with three Defendants (the Hickmans and Dr. Gaffney) rather than one Defendant, means nothing.   Here again, *Kemp* is instructive:

> Further, it is of no moment that the hub of this conspiracy involved two individuals instead of one. Smith recognized that the inquiry must focus not on the number of individuals who make up the hub, but on the character of the agreements between the spokes. See 82 F.3d at 1272. Thus, we conclude that appellants are correct that there was a variance between the conduct charged and proved.

500 F.3d at 291.

In *Rigas*, the Third Circuit noted that the overt acts related to the very same transactions by which the same defendants took Adelphia's corporate assets.   605 F.3d at 216.   And, of course, the drugs and illicit actions in *DeVarona* and *Blumenthal* clearly involved an overlap of personnel or (in many cases and) overt acts sufficient to establish a single conspiracy.

The following table, which is based directly on the allegations of Paragraph 24 in the Indictment, starkly demonstrates the lack of overlap regarding the Defendants involved in the overt acts:

-20-

| ¶24 | DEFENDANT(S) TO WHOM CRIMINAL LIABILITY FOR THE OVERT ACT IS ATTRIBUTED[4] | THE INDIVIDUAL (#) WHOSE PRESCRIPTION IS AT ISSUE |
|---|---|---|
| (a) | William Hickman | 1 |
| (b) | William Hickman | 1 |
| (c) | William Hickman | 2 |
| | | |
| | | |
| (d) | Christopher Broccoli | 3, 4 |
| (e) | Christopher Broccoli | 5 |
| (f) | Christopher Broccoli | Self |
| (g) | Christopher Broccoli | 6, 7, 8, 9 |
| | | |
| | | |
| (h) | William Hickman, Brian Pugh | 10, 11 |
| (i) | William Hickman, Brian Pugh | 12, 13 |
| (j) | William Hickman, Brian Pugh, Thomas Schallus | 14 |
| (k) | William Hickman, Brian Pugh, Thomas Schallus | 15 |
| (l) | William Hickman, Brian Pugh, Thomas Schallus | 16 |
| (z) | William Hickman, Brian Pugh | 28 |
| | | |
| | | |
| (m) | William Hickman, John Sher | 17, 18 |
| (n) | William Hickman, John Sher | 19 |
| (o) | William Hickman, John Sher | 20 |
| (p) | William Hickman, John Sher | 21, 22 |
| (q) | William Hickman, Thomas Sher | 23, 24 |
| (r) | William Hickman, Thomas Sher | 25, 26 |
| (s) | William Hickman, Thomas Sher | 27 |
| (t) | William Hickman, Thomas Sher | J. Sher |
| | | |
| | | |
| (u) | William Hickman | J. Holt |
| (v) | William Hickman, Sara Hickman | N/A |
| (w) | William Hickman, Sara Hickman | S. Hickman |

---

[4] Mr. Pugh is named in overt acts which claim that Defendants Hickman, Schallus and he "caused a prescription for [a particular individual] to be faxed to Compounding Pharmacy." Ind. ¶¶ 24(h)-(l), (z). Thus, Mr. Pugh is never accused of actually committing any act, but of engaging in some unidentified and nebulous conduct with one or two other people who "caused" some other unidentified person to commit the overt act. That type of transitive property accusation (a/k/a: a lack of proof against someone in any forum other than a grand jury) is a refrain in this Indictment.

| | | |
|---|---|---|
| (x) | William Hickman, Sarah Hickman | N/A |
| (y) | William Hickman, Sarah Hickman | N/A |
| | | |

Ind. ¶ 24.

Lest there be any doubt, the Court need only review the final version of the Rimless Wheel Conspiracy Chart, fully annotated with the Defendants, the Counts, the Overt Acts, the Individuals and the unindicted co-conspirators that Count 1 has the courage to place in a spoke:



          *       *       *       *       *

For all these reasons, the Motion should be granted.

-22-

III. **COUNTS 9 THROUGH 13 SHOULD BE DISMISSED BECAUSE THEY DO NOT ALLEGE A SINGLE FRAUDULENT STATEMENT OR MISREPRESENTATION.**

A. **Introduction**

The government has charged the Defendants with a total of 20 counts of substantive health care fraud.  In laying out this expansive theory of criminality, the government bears the onus of delineating the contours of the alleged fraud.  The factual allegations here, however, are paltry.  To wit, the Indictment fails to identify a single allegedly fraudulent statement or representation made by Mr. Pugh.  In omitting this and other critical information, the Indictment falls far short of the standards set by the Constitution and the Federal Rules.  *See* Fed. R. Crim. P. 7(c)(1) & 12.  Accordingly, the substantive health care fraud counts against Mr. Pugh should be dismissed.

B. **The Applicable Legal Standard**

As discussed, *supra*, in order to pass constitutional muster, an indictment "must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating."  *Hedaithy*, 392 F.3d at 589.  *See also Russell*, 369 U.S. at 764 (indictment must "sufficiently apprise the defendant of what he must be prepared to meet") (internal quotation marks omitted).  In this case, the substantive health care fraud counts come nowhere close to providing Mr. Pugh with the fair notice required by the Constitution.

To prevail on a charge of health care fraud, the government must prove:  (1) that the defendant knowingly devised or participated in a scheme to defraud the alleged victim or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of the alleged victim in connection with the delivery of or payment for health care benefits, items, or services; (2) that the defendant acted with the intent to defraud; and (3) that the alleged victim was a public or private plan or contract,

affecting commerce, under which medical benefits, items, or services were provided to any individual. *Third Circuit Model Criminal Jury Instructions*, 6.18.1347. By using the common-law term "defraud," the statute implicitly requires "misrepresentation or concealment of a material fact." *Neder v. United States*, 527 U.S. 1, 21-25 (1999) (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 579 (1996) ("[A]ctionable fraud requires a material misrepresentation or omission")).

An indictment must adequately allege each element of the offense. *Hamling*, 418 U.S. at 117. Although statutory language setting forth the elements "may be used in the general description of the offense," that description must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description with which he is charged." *Russell*, 369 U.S. at 765. Courts have recognized that providing a defendant with a statement of the facts and circumstances surrounding a specific offense is especially important in indictments charging fraud because of the generic nature of the term "scheme to defraud." *See United States v. Steffen*, 687 F.3d 1104, 1113 (8th Cir. 2012) ("[A]n indictment [that] alleges a scheme to defraud … must specify facts not merely in the general words of the statute, but with reasonable particularity as will apprise the defendant, with reasonable certainty, of the nature of the accusation."); *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir. 1982); *United States v. Curtis*, 506 F.2d 985, 990 (10th Cir. 1974) (indictment must identify "the particular pretenses, representations or promises claimed to have been false"). *Cf. United States v. Slawick*, 548 F.2d 75, 83-84 (3d Cir. 1977) (reversing perjury conviction where indictment failed precisely to state the alleged false statements). The substantive health care fraud counts utterly fail in that regard.

## C.   The Motion Should Be Granted Because Counts 9 Through 13 Fail To Allege A Material Misrepresentation.

The Indictment's failure to identify the alleged fraudulent representations made by Mr. Pugh and his co-Defendants renders it unconstitutionally vague.   Before turning to the Indictment's barebones allegations, it is important to note what the Indictment does *not* allege. To wit, unlike cases charging fraud relating to Medicare, Medicaid, Tricare, etc., here there is no allegation that the Defendants, or the unindicted co-conspirators for that matter, signed documents stating that they would follow all applicable rules and regulations.  *See, e.g.*, *United States v. Medina*, 485 F.3d 1292, 1297 (11th Cir. 2007) (holding that "a reasonable jury could conclude that [defendant] committed healthcare fraud after she signed the applications stating that she would follow Medicare's rules and regulations"); *United States v. Ferrell*, No. 11 CR 595, 2013 WL 2636108, *10 (N.D. Ill. June 12, 2013)  (noting that government intended to use Medicare applications submitted by defendant to show that he "was aware of the Medicare Rules and Regulations and certified that he would comply with all such rules and regulations" and that "he acted knowingly").  This case, in contrast, implicates two state insurance plans as opposed to a federal health care program, and there is no allegation in the Indictment that anyone signed any agreement to comply with any particular requirements or standards applicable to those insurance plans.  In the absence of any such allegation, the Indictment, as is becoming a refrain, resorts to broad generalizations, which fall well short of what is required by the Constitution and the Federal Rules.

The closest articulation of any allegedly false or fraudulent representations appears in a general sense in Paragraph 18.  There, the Indictment alleges that the Defendants secured or caused to be secured the signatures of John Gaffney and "other" doctors on prescription forms for individuals

    (a) without the doctors having a doctor/patient relationship with the individuals;
    (b) without the doctors determining that the individuals had a medical necessity

> for the compounded medication selected; (c) without the doctors considering a non-compounded prescription or over-the-counter medication for the individuals; and/or (d) without the doctors having evaluated whether the compounded medication would have any adverse effect on the individuals.

Ind. ¶ 18.  Given the disjunctive language that appears in Paragraph 18, **"and/or,"** it is entirely unclear which prescription forms were characterized by which of the foregoing alleged deficiencies and whether those forms suffered from only one or more than one of the alleged deficiencies.

In addition to the vagueness issues discussed, *supra*, three of the alleged "representations" listed above do not constitute health care fraud as a matter of law, which lends further support for their dismissal.  *See United States v. Panarella*, 277 F.3d 678, 683-85 (3d Cir. 2002) (holding that indictment should be dismissed if it fails to state an offense because the specific facts alleged fall beyond the scope of the relevant criminal statute); *United States v. Adkinson*, 135 F.3d 1363, 1373 (11th Cir. 1998) (reversing convictions because the indictment alleged conduct that was not a crime under the prevailing law).  First, option (a) – "without the doctors having a doctor/patient relationship with the individuals" – is impermissibly vague.  It is unclear whether the Indictment means to allege that the doctors did not have an *existing* doctor/patient relationship with the individual or whether it means to say that doctors did not actually see/consult with the individual.  If it is the former, it is not apparent what law, rule, or regulation (the Indictment cites to none) requires there to be an *existing* doctor/patient relationship in order for a doctor to properly sign a prescription form and, in the absence of such requirement, the alleged representation is not material and cannot form the basis of health care fraud.  If it is the latter, Mr. Pugh is entitled to far more information regarding which doctor allegedly signed a prescription form without having seen/consulted with the patient.

Next, option (c) – "without the doctors considering a non-compounded prescription or over-the-counter medication for the individuals" – suffers from the same flaw as option (a).  It is

-26-

not clear if the government contends that this is required by some law or regulation; no such law or regulation is cited in the Indictment. Thus, it follows that any alleged representation regarding a doctor's consideration of a "non-compounded prescription or over-the-counter medication" is not and cannot be material for purposes of the health care fraud statute.

Similarly, option (d) – "without the doctors having evaluated whether the compounded medication would have any adverse effect on the individuals." As with the foregoing options, it is unclear if this was required by law, rule, or regulation, and if so, which one. The Indictment cites to none. It is also unclear what representation was made regarding "any adverse effect" and how it was material for purposes of demonstrating health care fraud.

Finally, only option (b) – "without the doctors determining that the individuals had a medical necessity for the compounded medication selected" -- is even arguably sufficient for purposes of alleging the offense of health care fraud. But the Indictment fails to define the term "medical necessity." Nor does it specify a law, rule, regulation or even industry standard with which the doctors allegedly failed to comply.

Moreover, courts have held that in a health care fraud case, "the defendant must be shown to have known that the claims submitted were, in fact, false." *Medina*, 485 F.3d at 1297. *See also United States v. Laughlin*, 26 F.3d 1523, 1526 (10th Cir. 1994) (holding that knowledge of falsity was essential element of analogous Medicaid fraud offense); *United States v. Larm*, 824 F.2d 780 (9th Cir. 1987) (same). Nowhere in the Indictment does it allege that Mr. Pugh knew that the allegedly false statements were, in fact, false at the time they were made. *Compare Laughlin*, 26 F.3d at 1528 & n.9 (noting that indictment contained "an accurate description of the *mens rea* for Medicaid fraud" where it alleged that "the defendant herein, then and there well knew said statements and representations on the application forms submitted were false").

Finally, the Indictment also alleges that Hickman and "others" paid Dr. Gaffney and "others" as a "reward" for signing prescription forms. Ind. ¶ 19.  The Indictment, however, does not allege that Mr. Pugh or the other Defendants violated the federal Anti-Kickback Statute, 42 U.S.C. § 1320a–7b(b) (nor could it given that there is no federal health care program implicated here).   To the extent this allegation is somehow meant to describe the "fraudulent representations" allegedly made by the Defendants, it completely misses the mark.  Courts have held that "kickbacks," standing alone, are not false/fraudulent representations. *See Medina*, 485 F.3d at 1298 ("While we acknowledge that paying kickbacks like those at issue in this case is a violations of 42 U.S.C. § 1320a–7b(b)(2)(A), we cannot hold that this conduct alone is sufficient to establish health care fraud without someone making a knowing false or fraudulent representation to Medicare.").

For all of the foregoing reasons, the substantive health care fraud charges lodged against Mr. Pugh in Counts 9 through 13 fail to state an offense and, therefore, should be dismissed.

## IV.     COUNT 28 SHOULD BE DISMISSED BECAUSE IT FAILS TO ALLEGE A SINGLE CONSPIRACY.

### A.     Introduction

The Court should dismiss Count 28 because it, like Count 1, alleges multiple rather than a single conspiracy.

### B.     The Applicable Legal Standard

Count 28 suffers from many of the same flaws as Count 1, including the failure to adequately allege: (1) "a common goal among the conspirators;" (2) an "agreement [that] contemplated bringing to pass a continuous result that [would] not continue without the continuous cooperation of the conspirators;" and (3) "overlap [among the participants] in the various dealings." *Kelly*, 892 F.2d at 258 (citations and internal quotation marks omitted).  Each of these three factors is discussed herein.

### C.     The Motion Should Be Granted Because Count 28 Suffers From Similar Deficiencies As Count 1.

First, regarding a common goal, the Indictment lacks any factual allegations to support the charge that Mr. Pugh knowingly conspired and agreed with Sara Hickman and William Hickman to engage in certain monetary transactions in violation of federal law.  The Indictment is bereft of any allegations regarding any supposed meetings, telephone calls, emails, etc., regarding any of the monetary transactions at issue, let alone regarding a purported unitary goal of engaging in all of them.

Second, the allegations do not support the existence of an "agreement [that] contemplated bringing to pass a continuous result that [would] not continue without the continuous cooperation of the conspirators." *Id.*  To the contrary, the various monetary transactions enumerated in Count 28 could each stand alone (and, in fact, do stand alone in Counts 29-50), and did not require the continuous cooperation of Mr. Pugh and the Hickmans.  For this reason as well, Count 28 is not properly pled as a single conspiracy.

<u>Third</u>, regarding "overlap [among the participants] in the various dealings," it is obvious upon a quick perusal of Count 28 that this factor weighs in favor of dismissal.  There is **<u>only one</u>** transaction listed in the Count that involves both Mr. Pugh and the Hickmans (involving a check in the amount of $147,939.06 from Boardwalk Medical, LLC to BP Med 1 LLC, which the Hickmans and Mr. Pugh allegedly "caused" to be written on December 21, 2015).  That is but a slender reed for the government to lean on in charging Mr. Pugh with criminal liability for <u>$5,260,419.92</u> in monetary transactions.

In light of the foregoing, it is clear that the government has improperly swept all of the monetary transactions at issue in this case under the umbrella of one large money laundering conspiracy.  As discussed at length, *supra*, federal courts do not abide this charging tactic.  *See Evans*, 970 F.2d at 674.  Indeed, the risk of "transference of guilt from one to another" in this scenario is simply too great.  *Kotteakos*, 328 U.S. at 774.  Accordingly, Count 28 should be dismissed.

## V.      COUNTS 37, 38, 49 & 50 SHOULD BE DISMISSED BECAUSE THEY CHARGE MR. PUGH WITH AN OFFENSE THAT IS NOT COGNIZABLE AT LAW.

### A.      Introduction

The government must live with the Indictment as returned by the grand jury and in this case that document does not state a cognizable federal crime.  It is well-settled – some would say common sense and obvious – that a defendant cannot aid and abet himself.  Yet that is precisely how and why the government seeks to deprive Mr. Pugh of his liberty based upon the Counts 37, 38, 49 and 50.  Pursuant to Rule 12, those Counts should be dismissed.

### B.      The Applicable Legal Standard

The statute criminalizing aiding and abetting is set forth at 18 U.S.C. § 2, and states:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
>
> (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

18 U.S.C. § 2.  *Central Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 181-82 (1994) ("Aiding and abetting is an ancient criminal law doctrine.  Though there is no federal common law of crimes, Congress in 1909 enacted what is now 18 U.S.C. § 2, a general aiding and abetting statute applicable to all federal criminal offenses"); *Pennsylvania Ass'n of Edwards Heirs*, 235 F.3d 839, 844 (3d Cir. 2000) (quoting *Central Bank*, 511 U.S. at 181-82) ("The statute decrees that those who provide knowing aid to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime.").

Under federal law, a defendant cannot aid and abet himself.  *United States v. Hassoun*, 476 F.3d 1181, 1184 n.2 (11th Cir. 2007) (citing *United States v. Martin*, 747 F.2d 1404, 1407 (11th Cir. 1984)); *United States v. Verners*, 53 F.3d 291, 295 n.2 (10th Cir. 1995) ("One cannot … aid and abet oneself"); *United States v. Brown*, 7 F.3d 1155, 1163 (5th Cir. 1993) (same);

-31-

*United States v. Doughty*, 460 F.2d 1360, 1363 (7th Cir. 1972) (same).  *See also United States v. Cartwright*, 359 F.3d 281, 287 (3d Cir. 2004) (confirming that a conviction on a charge of aiding and abetting requires that one individual commit a substantive offense and <u>another</u> act with the goal of facilitating that offense); *United States v. Salmon*, 944 F.2d 1106, 1113 (3d Cir. 1991) (stating that a conviction on such a charge "requires that <u>another</u> committed the substantive offense and that the one charged with aiding and abetting knew of the substantive-offense commission and acted with the intent to facilitate it") (emphasis added) (citing *United States v. Dixon*, 658 F.2d 181, 189 n.17 (3d Cir. 1981); *United States v. Nolan*, 718 F.2d 589, 592 (3d Cir. 1983) (stating that a conviction for aiding and abetting requires that "the aider or abettor must know that <u>the other</u> is committing a crime ... the aider or abettor must have the purpose to aid that other to commit the crime") (emphasis added).  *See also Nye & Nissen v. United States*, 336 U.S. 613, 618 (1949 (stating that "[i]n order to aid and abet <u>another</u> to commit a crime it is necessary that a defendant" work with someone else) (emphasis added); *United States v. Landers*, 417 F.3d 958, 965 (8th Cir. 2005) (noting that the "Notes on Use" to Section 5.01 of the Eighth Circuit Model Criminal Jury Instruction provides that "a person cannot aid and abet himself in the commission of a crime" (Bright, J., dissenting)); *United States v. Beutenmuller*, 29 F.3d 973, 982 (5th Cir. 1994) (stating that to impose Section 2 liability, "the government must demonstrate beyond a reasonable doubt ... that each element of the offense ... was committed by <u>some other person</u>") (emphasis added) (citation omitted); *United States v. Mann*, 811 F.2d 495, 497 (9th Cir. 1987) (noting that Section 2 "permits one to be found guilty as a principal for aiding or procuring <u>someone else</u> to commit the offense") (emphasis added) (citation omitted); *United States v. Martin*, 747 F.2d 1404, 1407 (11th Cir. 1984) (same).

**C.      <u>The Motion Should Be Granted</u>**

Here, in Counts 37, 38, 49 and 50, Brian Pugh is charged with aiding and abetting himself, which is simply not a federal crime.  Sticking to the four corners of the Indictment, as

the Court must, the document can only be read as charging "an offense not known to the law," *Martin,* 747 F.2d at 1407, *i.e.*, Mr. Pugh is the only Defendant in these Counts.  That is not a crime "under the prevailing law," *Adkinson*, 135 F.3d at 1373, and the Court thus has little choice: the Counts must be dismissed.  Indeed, dismissal is the only way to vindicate the Fifth Amendment's guarantee that a grand jury may only call a person to answer charges if, in fact, the indictment alleges a cognizable federal crime.  For that reason, this motion should be granted.

Courts readily dismiss indictments or reverse convictions when a defendant has been charged with acts that do not constitute a federal crime.  As the court concluded in *United States v. Seitz*, 952 F. Supp. 229, 238 (E.D. Pa. 1997):

> In order for an indictment to be valid, the Government must allege that the defendant acted in a way that, if proven, would constitute a violation of the law.  *See, e.g.*, *United States v. Polychron*, 841 F. 2d 833 (8th Cir. 1988).  If the facts alleged do not amount to a crime, then we must dismiss the indictment.

Indeed, in *Seitz*, the court dismissed the indictment (which was partially based upon 18 U.S.C. § 2) in total and, in part, with prejudice.  *Id.*  Many other courts have reached similar conclusions.  *See, e.g.*, *United States v. Chandler*, 388 F.3d at 813 (reversing convictions and ordering entry of judgment of acquittal because the indictment failed to allege a crime); *United States v. Combs*, 369 F.3d 925, 929 (6th Cir. 2004) (reversing conviction and remanding with order to dismiss count of indictment because it failed to charge the defendant with a cognizable federal crime); *United States v. Panarella*, 277 F.3d 678, 683-85 (3d Cir. 2002) (holding that indictment should be dismissed if it fails to state an offense because the specific facts alleged fall beyond the scope of the relevant criminal statute); *United States v. Adkinson*, 135 F.3d at 1373 (reversing convictions because the indictment alleged conduct that was not a crime under the prevailing law); *United States v. Green*, 797 F.2d 855, 858 (10th Cir. 1986) (reversing conviction of defendant who pleaded guilty because the indictment did not allege a federal crime); *United States v. Martin*, 747 F.2d 1404, 1408 (11th Cir. 1984) (reversing conviction where defendant

-33-

was charged with aiding and abetting, but the indictment was silent on the existence of the principal actor); *United States v. Beard*, 436 F.2d 1084, 1086, 1091 (5th Cir. 1971) (reversing conviction in a case where the indictment failed to charge a crime); *United States v. Freeman*, 443 F. Supp. 288, 291 (N.D. Cal. 1977) (dismissing one count of an indictment because it did not allege acts that were a crime); *United States v. Tyndall*, 400 F. Supp. 949, 953 (D. Neb. 1975) (dismissing indictment that did not allege acts constituting a crime); *United States v. Birdsall*, 195 F. 980, 981 (N.D. Iowa 1912) (dismissing indictments because they did not allege a crime).

Based upon the protections afforded by the Fifth and Sixth Amendments and Rule 7, indictments are held to certain standards.  Specifically, "[i]n order to be valid, an indictment must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating." *United States v. Hedaithy*, 392 F.3d at 589 (citing *Zauber*, 857 F.2d at 144).  If an indictment fails to state an offense, it must be dismissed. *United States v. Adkinson*, 135 F.3d at 1373 (11th Cir. 1998) (reversing convictions because the indictment alleged conduct that was not a crime under the prevailing law).  *See* Fed. R. Crim. P. 12(b)(3)(B) (authorizing district courts to hear a motion to dismiss an indictment for failure to state an offense at any time during the pendency of the matter); *United States v. Mendoza*, 390 F. Supp. 2d 925, 928 (N.D. Cal. 2005) (dismissing indictment because it did not allege a crime and, in fact, was based upon allegations that could not -- as a matter of law -- constitute a crime).

Thus Counts 37, 38, 49 and 50 should be dismissed because they charge Mr. Pugh with something that is not a cognizable crime, namely, aiding and abetting himself.

## VI.   THE GOVERNMENT MUST PROVIDE A BILL OF PARTICULARS.

### A.   Introduction

Mr. Pugh is entitled to demand bill of particulars as a matter of right where, as here, charges are "couched in such language that the defendant is liable to be surprised and unprepared" at trial. *Singer v. United States,* 58 F.2d 74, 76 (3d Cir. 1944). As the Third Circuit has stated:

> The purpose of a bill of particulars is 'to inform the defendant of the nature of the charges brought against him, to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense.'

*United States v. Urban*, 404 F.3d 754, 771 (3d Cir. 2005) (quoting *United States v. Addonizio*, 451 F.2d 49, 63-64 (3d Cir. 1971)).

### B.   The Applicable Legal Standard

Federal Rule of Criminal Procedure 7(f), which authorizes Mr. Pugh to seek a bill of particulars regarding certain vague allegations against him was specifically amended "to encourage a more liberal attitude by courts toward bills of particulars." *United States v. Rosa*, 891 F.2d, 1063, 1066 (3d Cir. 1989) (requiring bill of particulars "whenever an indictment's failure to provide factual or legal information significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial"). *See also Urban*, 404 F.3d at 771; *United States v. DePaoli*, 41 Fed. Appx. 543, 546 (3d Cir. 2002); *Singer*, 58 F.2d at 76; *United States v. Davidoff*, 845 F.2d 1151, 1155 (2d Cir. 1988) (holding that the district court erred in refusing to grant bill of particulars which was vital to defendants' understanding of charges against them and to their preparation of a defense); *United States v. Bortnovsky*, 820 F.2d 572, 575 (2d Cir. 1987) (same).

Moreover, defendants are entitled to "be informed of those central facts which would enable him [or her] to conduct his [or her] own investigation." *United States v. Gatto,* 746 F. Supp. 432, 477 (D.N.J. 1990) (quoting *United States v. Johnson,* 524 F. Supp. 199, 207 (D. Del. 1981), *rev'd on other grounds,* 690 F.2d 60, 66 (3d Cir. 1982). A bill of particulars supplements an indictment, thereby enabling a criminal defendant to adequately prepare his defense, to avoid unfair surprise at trial, to avoid double jeopardy based on a future prosecution for ambiguously described conduct. *See generally DePaoli*, 41 Fed. Appx. at 546 (noting that a bill of particulars is intended "to inform the defendant of the nature of the charges against him"); *United States v. Smith*, 776 F.2d 1104, 1111 (3d Cir. 1985) ("a bill of particulars, like discovery, provides information to the defendant for use in his or her defense"); *United States v. Adams*, 759 F.2d 1099, 1113 (3d Cir. 1985) (a bill of particulars is necessary when the "deprivation of the information sought leads to the defendant's inability to adequately prepare his case, to avoid surprise at trial, or to avoid the later risk of double jeopardy"); *United States v. Murray,* 297 F.2d 812, 819 (2d Cir. 1962) ("The function of a bill of particulars is to enable the accused to prepare for trial and to prevent surprise").

Honoring the liberal view of a defendant's request for a bill of particulars, the Third Circuit noted that a defendant's request for a bill of particulars related to legitimate information may not be denied merely because providing the information would divulge details of the government's evidence. *Addonizio*, 451 F.2d at 64 n.16. Nor is it a response that "defendant should know the facts demanded, for the defendant is presumed innocent; in any event, the Bill of Particulars is aimed at the facts as alleged by the Government, rather than as they actually exist." *United States v. Ramirez,* 602 F. Supp. 783, 793 (S.D.N.Y. 1985). "[F]undamental fairness and the spirit of the amendment to Rule 7(f) require that defendant be informed of the identity of persons" with whom defendant engaged in alleged illegal activity. *United States v. Wynn*, 54 F.R.D. 72, 74 (E.D. Pa. 1971).

-36-

"The function of a bill of particulars in a criminal case is to render an indictment sufficiently specific to apprise a defendant, as required by the Sixth Amendment of the Constitution of the United States, of the nature and cause of the accusation in order that he may prepare for trial; may be spared surprise at the trial; and, after judgment, may be able to plead the record and judgment in bar of a further prosecution for the same offense." *United States v. Giramonti,* 26 F.R.D. 168, 169 (D. Conn. 1960) (citing *Wong Tai v. United States,* 273 U.S. 77, 80-81 (1927)). Thus, although the decision on a motion for a bill of particulars is committed to the sound discretion of a court, *Will v. United States,* 389 U.S. 90, 98-99 (1967), that discretion is abused where the deprivation of the information sought by a bill of particulars leads to a defendant's inability to adequately prepare his case, to avoid surprise at trial, or to avoid the later risk of double jeopardy. *United States v. Moyer,* 674 F.3d 192, 203 (3d Cir. 2012). A court must issue a bill of particulars where an "indictment fails to perform these functions and thereby 'significantly impairs the defendant's ability to prepare his defense or is likely to lead to prejudicial surprise at trial.'" *Urban,* 404 F.3d at 771-72 (quoting *Rosa,* 891 F.2d at 1066). *See also United States v. Vastola,* 670 F. Supp. 1244, 1260 (D.N.J. 1987).

When, as Mr. Pugh does in the following Section, a defendant makes the appropriate showing, federal courts do not hesitate to order the government to produce a bill of particulars. *See, e.g.,* *United States v. Mariani,* 90 F. Supp. 2d 574 (M.D. Pa. 2000) ("In similar circumstances, disclosure of co-conspirators and other participants in alleged offenses has been required."). *See also United States v. Lino,* 00-CR-632 WHP, 2001 WL 8356, *1, *13 (S.D.N.Y. Jan. 20, 2001) (ordering that "the bill of particulars shall state, with respect to each paragraph in which the word 'others' appears, the identity of the person or persons referenced by the expression 'others,' if known to the Government, in any count or racketeering act in which the Government will contend at trial that that person was a co-conspirator of a defendant or defendants"); *United States v. DeGroote,* 122 F.R.D. 131, 137 (W.D.N.Y. 1988) (granting

motion for bill of particulars identifying co-conspirators); *Vastola*, 670 F. Supp. at 1270 (requiring the government to disclose "the precise date and place of each event alleged in the indictment," as well as "the names of all co-conspirators or participants in the alleged offenses."); *United States v. Pinto-Thomas,* 352 F. Supp.3d 287 (S.D.N.Y. 2018) (granting a motion for a bill of particulars identifying "others known and unknown"); *United States v. Ramirez,* 602 F. Supp. at 793 (government ordered to furnish "[a] statement of the names of other co-conspirators with whom Gonzalez allegedly conspired with or dealt with directly"); *United States v. Enger*, 472 F. Supp. 490, 512 (D.N.J. 1978) (granting defendant's motion for list of names of unidentified co-conspirators); *United States v. Rosenstein,* 303 F. Supp. 210, 213 (S.D.N.Y. 1969) (government directed to "[i]dentify each co-conspirator alleged in the indictment as 'diverse other persons to the Grand Jury unknown,' by name and address, as such conspirators become known to the prosecution"); *United States v. Covelli*, 210 F. Supp. 589, 590 (N.D. Ill. 1962) (government ordered to identify the names and addresses of any co-conspirators who had become known to the government after the indictment was returned, and "the fact that they were not known at the time of presentment before the grand jury is merely fortuitous and cannot be a basis for refusal to disclose"); *United States v. Barrett*, 153 F. Supp. 3d 552, 572-73 (E.D.N.Y. 2015) (requiring the government to provide a bill of particulars identifying known co-conspirators listed in the indictment as "others").

Even in cases where "no other persons are named in the indictment as participants," fundamental fairness and the spirit of Rule 7(f) requires that defendant be made aware of the identities of the individuals the government alleges the defendant has transacted with. *Wynn*, 54 F.R.D. at 74. To do otherwise would run afoul of Mr. Pugh's Sixth Amendment right to know of the charges against him.

### C.  The Court Should Grant This Motion.

The Indictment goes well beyond the surplusage-like use of "and others" that is standard in the U.S. Attorney's Manual for indictments.  With this motion, Mr. Pugh seeks facts, which is the appropriate goal of a motion for a bill of particulars.  "The purpose of a bill of particulars is to secure facts, not legal theories." *Kempe v. United States*, 151 F.2d 680, 685 (8th Cir. 1945). Mr. Pugh does not seek the government's legal theories, only sufficient facts so he can properly conduct his own investigation into the conduct the government alleges in the Indictment.  *United States v. Delle Donna,* 552 F. Supp. 2d 475, 498 (D.N.J. 2008) (A bill of particulars is intended to give the defendant information to conduct his own investigation).

Discovery in this case has been voluminous, spanning hundreds of thousands and potentially millions of pages of documents.  While Mr. Pugh appreciates the government's disclosure with respect to the volume of information, it does not alleviate the problem that the lack of disclosure in the Indictment frustrates Mr. Pugh's ability to engage in his own investigation, something that a bill of particulars would enable.  *United States v. Urso,* 369 F. Supp. 2d 254, 771 (E.D.N.Y. 2005) ("However, a bill of particulars is appropriately granted where the government's pre-trial discovery disclosures are so voluminous that the defendant remains in the dark about the specific acts of which he is accused").  Further, the volume of pre-trial disclosure actually weighs in favor of a bill of particulars.  *Barrett,* 153 F. Supp.3d at 573 (stating that the voluminous pre-trial disclosure, greater than ten thousand pages of documents, weighed in favor of granting a bill of particulars).

#### 1.  False/Fraudulent Representations

Finally, the Indictment alleges that Mr. Pugh and his co-Defendants engaged in a conspiracy to commit health care fraud, and also committed a number of substantive health care offenses.  The Indictment, however, fails to specify what false representations were made by Mr. Pugh.  The government should be required to provide "information as to exactly what the false

statements are, what about them is false, who made them, and how [Mr. Pugh] caused them to be made." *United States v. Trie*, 21 F. Supp. 2d 7, 21-22 (D.D.C. 1998).

While, as the government will predictably argue in response, it may be sufficient under some circumstances for an indictment to simply track statutory language, that is not appropriate here where the statutory language leaves too much ambiguity. As the Third Circuit has stated:

> In an indictment upon a statute, it is not sufficient to set forth the offence in the words of the statute, unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished…. Undoubtedly, the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged.

*United States v. Knox Coal Co.*, 347 F.2d 33, 37-38 (3d Cir. 1965) (internal quotations and citations omitted). Indeed, under similar circumstances, courts have routinely directed the government to provide bills of particulars clarifying similar terms. *See Bortnovsky*, 820 F.2d at 575 (holding that district court erred in refusing to grant bill of particulars identifying which of defendant's insurance claims were fraudulent and which invoices were falsified; as a result, "defense counsel … were left unguided as to which documents would be proven falsified or which of some fifteen [acts] would be demonstrated to be staged"); *Lino*, 2001 WL 8356, at *6 (noting that "courts routinely award" bills of particular regarding "allegations of false statements") (citations omitted); *United States v. Hsia*, 24 F. Supp. 2d 14, 32 (D.D.C. 1998) (ordering "a bill of particulars disclosing how Ms. Hsia is alleged to have caused each of the false statements to be made"); *United States v. Risk*, 672 F. Supp. 346, 360 (S.D. Ind. 1987) (ordering "the Government to disclose to the defendant the specific portions, segments, or sentences of the bank report that are alleged to be and that the Government intends to prove are false."), *aff'd*, 843 F.2d 1049 (7th Cr. 1988); *United States v. Konefal*, 566 F. Supp 698, 703

(N.D.N.Y. 1983) ("The Government has not alleged what statements it contends are false, nor has it alleged the material facts which it contends the defendants concealed.  While the Government need not disclose the evidentiary details of its case, the Court finds that defendants should be apprised of these basic details concerning count III."); *United States v. McCoy*, 492 F. Supp. 540, 545  (M.D. Fl. 1980) ("The defendant is entitled to a bill of particulars setting forth each false and fraudulent pretense and representation described generally in the indictment."); *United  States v. Caine*, 270 F. Supp. 801, 806 (S.D.N.Y. 1967) (same).

2. <u>The Indictment only identifies one of several alleged recruits.</u>

The Indictment repeatedly uses the act of recruiting, interacting with recruits and paying recruits as a basis to for potential criminal liability against Mr. Pugh and his co-Defendants.  *See, e.g.*, Ind. ¶ 7 (Defendants and others "recruit individuals who would agree to obtain prescriptions and find additional recruiters"); ¶ 8 (Defendants secured agreement "to recruit individual to agree to obtain prescriptions); ¶ 9 (Defendants paid out and received money "for the prescriptions that they and their recruiters obtained"); ¶ 10 (Defendants "and others recruited state and local government and education employees"); ¶ 11 (Defendants "and others paid other individuals to recruit Public Employees and other individuals"); ¶ 12 (Defendants "and others paid money and other benefits to individuals to induce and reward the for agreeing to obtain prescriptions[,]" *i.e.*, paid recruits); ¶ 13 (Defendants "and others would persuade individuals to agree to obtain" prescriptions without seeing a doctor); ¶ 14 (Defendants "and others would obtain insurance information from these individuals and complete and cause the completion" of forms); ¶ 22 (Defendants and others "caused individuals to receive compounded medication that the individuals did not first discuss with their recruiter or doctor").

With respect to Brian Pugh, the Indictment alleges that

> BRIAN PUGH secured the agreement of defendant THOMAS SCHALLUS **<u>and others</u>**, in exchange for a share of the amount

-41-

>that defendant Brian Pugh received for the prescriptions, to recruit
>individuals to agree to obtain prescriptions ….

Ind. ¶ 8 (emphasis added).  *Wynn*, 54 F.R.D. at 74 (stating "fundamental fairness and the spirit of the amendment to Rule 7(f) require that defendant be informed of the identity of persons" he was alleged to have illegally transacted with).   Thus, while the Indictment identifies one alleged recruit, co-Defendant Thomas Schallus, it does not enable Mr. Pugh to prepare for trial regarding two or more alleged recruits.  The Indictment literally withholds the identity of more recruits than it discloses.   The identify of Mr. Pugh's alleged "recruits" is critical to, among other important trial rights, his ability to avoid surprise and prepare for trial.  *Urban*, 404 F.3d at 771. The government must detail the name of every single person it believes Mr. Pugh recruited.

As the Indictment stands, Mr. Pugh has no way of knowing the identity of these alleged "other" unindicted co-conspirators Mr. Pugh's ability to investigate and prepare a defense has been hampered as the government has charged him with the crime of conspiracy but holds back the identity of his co-conspirators.  Without knowing who he is alleged to have conspired with, Mr. Pugh has no ability to conduct an investigation into the charges against him.  *Delle Donna,* 552 F. Supp. 2d at 498 (A bill of particulars is intended to give the defendant information to conduct his own investigation).  Absent the names of these unindicted co-conspirators, Mr. Pugh has no way of knowing what conduct the government alleges was related to the conspiracy, who he is alleged to have conspired with, and will have no ability to conduct his own investigation and prepare a defense.  Ostensibly, Mr. Pugh may learn the identity of these "others" at trial, however, by that point it is too late.  The purpose of the Indictment is to make Mr. Pugh aware of the charges against him and the conduct he is accused of ***before*** trial and to prevent trial by surprise.  *Moyer*, 674 F.3d at 203.

3.    <u>People Who Allegedly Paid Dr. Gaffney</u>

On one of the most critical allegations in this case is that doctors received payments in connection with the alleged scheme. Dr. John Gaffney, who is at the center of the alleged conspiracy and the only doctor named in the Indictment, is an unindicted co-conspirator. Ind. ¶ 1. The Indictment threatens that there are "other" doctors as well. Ind. ¶ 18. As usual, however, when it comes to *who* paid the doctors, or even *with what they were paid*, they Indictment fizzles into opacity, drifting from the "sufficient precision," *United States v. Matos-Peralta*, 691 F. Supp. 780, 791 (S.D.N.Y. 1988), to which Mr. Pugh is entitled as he prepares to go to trial and defend his liberty.

After years of investigation, a self-congratulatory, backslapping FBI "perp-walk," and millions of dollars of taxpayer money spent, this is what the government has told Mr. Pugh via its Indictment:

> It was further part of the conspiracy that defendant William Hickman *and others* paid and *caused to be paid* money and *other benefits* to co-conspirator John Gaffney *and others* to reward them for signing prescriptions for compounded medications.

Ind. at 10, ¶ 19 (emphasis added). The "others" are never identified. The manner in which Mr. Hickman or others allegedly "caused" payments to be made are never described. The "other benefits" are never set forth. The "others" who received the "money and other benefits" are never identified.

Thus, the critical paragraph, on a critical issue, says nothing at all that enables Mr. Pugh be informed "'of the nature of the charges brought against him, to adequately prepare his defense, to avoid surprise during the trial and to protect him against a second prosecution for an inadequately described offense.'" *Urban*, 404 F.3d at 771 (quoting *Addonizio*, 451 F.2d at 63-64). "[I]t is a legitimate office of a bill of particulars to supply the narrowing specificity by which this defendant is now enlightened." *United States v. Sweig,* 316 F. Supp. 1148, 1164 (S.D.N.Y. 1970). Under these circumstances, where there is no danger to anyone, the Court

-43-

should require the government put up, and fill in these vague phrases with details. *United States v. Holman,* 490 F. Supp. 755, 762 (E.D. Pa. 1980) (requiring government to "disclose names of all co-conspirators or participants in alleged offenses known to the Government and their addresses at time of their alleged participation" except where the government could show danger to perspective witnesses); *Pinto-Thomas,* 352 F. Supp. 3d at 303 (requiring government disclosure of unindicted co-conspirators where the government made no showing of legitimate safety concerns).

Mr. Pugh cannot possibly prepare a defense against these allegations without being made aware of whom the government alleges he conspired with. Mr. Pugh is innocent until proven guilty, and cannot possibly know what overt acts he has been accused of unless the government conclusively discloses those individuals he has allegedly conspired with. *Ramirez,* 602 F. Supp. at 793. To do otherwise would be trial by surprise, the precise miscarriage of justice that a bill of particulars is intended to combat. *Urban*, 404 F.3d at 771

> 4. The Preparation And Faxing Of Prescription Forms From Doctors' Offices.

The allegations that are (sort of) directly made against Mr. Pugh are extremely limited, focusing on five faxes which the government has weaponized to prosecute Mr. Pugh for a multi-million fraud (the "Five Fax Allegations"). Regarding the Five Fax Allegations, the Indictment provides Mr. Pugh with the only following information so that he can prepare his defense, avoid trial surprise and effectively plead double jeopardy:

> h. In or about October 2015, defendants WILLIAM HICKMAN and BRIAN PUGH ***caused*** prescriptions for Individual 10 and Individual 11 ***to be completed and faxed*** to Compounding Pharmacy.

> i. In or about October 2015, defendants WILLIAM HICKMAN and BRIAN PUGH ***caused*** prescriptions for Individual 12 and Individual 13 ***to be completed and faxed*** to Compounding Pharmacy.

j. In or about October 2015, defendants WILLIAM HICKMAN, BRIAN PUGH, and THOMAS SCHALLUS ***caused*** prescriptions for Individual 14 ***to be completed and faxed*** to Compounding Pharmacy.

k. In or about November 2015, defendants WILLIAM HICKMAN, BRIAN PUGH, and THOMAS SCHALLUS ***caused*** a prescription for Individual 15 ***to be completed and faxed*** to Compounding Pharmacy.

l. In or about October 2015, defendants WILLIAM HICKMAN, BRIAN PUGH, and THOMAS SCHALLUS ***caused*** a prescription for Individual 16 ***to be completed and faxed*** to Compounding Pharmacy.

Ind. ¶ 1 (emphasis added). Those vague allegations regarding the preparation and submission of the faxes (quoted above from the overt acts in Count 1), are recycled essentially verbatim as the basis for the substantive health care fraud claims upon which Counts Nine through Thirteen against Mr. Pugh and others are based. Ind. at 12.

Neither Count 1's overt acts nor Counts 9 through 13 state that Mr. Pugh completed and faxed the prescriptions to the Compounding Pharmacy from a doctor's office (which, in keeping with the Indictment's strategically placed opacity to conceal a lack of ultimate proof against Mr. Pugh, is neither identified nor limited to Dr. Gaffney.) Ind. at 16. The Five Fax Allegations do not charge Mr. Pugh with completing or faxing those documents. Critically, the Five Fax Allegations charge neither Defendant Hickman nor Schallus with completing or faxing those documents.

Further, there is absolutely no detail what it means to "cause" a prescription to be faxed, whether it was through an alleged co-Defendant, an unindicted co-conspirator, an unwitting participant, one of the many buckets of "others" from which the government has to choose, or some other manner of occurrence.

-45-

On this issue, Paragraph 20 is a microcosmic example of how the Indictment uses many words to provide virtually no real information as Mr. Pugh prepares to defend himself and to take the other steps that a bill of particulars is intended to further:

> it was further part of the conspiracy that once a compounding pharmacy pre-printed prescription form was completed with the signature of a doctor, defendants WILLIAM HICKMAN, BRIAN PUGH, THOMAS SCHALLUS, JOHN SHER, THOMAS SHER, CHRISTOPHER BROCCOLI, and others caused the completed prescriptions to be sent via fax from the office of the signing doctor in New Jersey to compounding pharmacy in Louisiana, which filled the prescription and billed pharmacy benefits administrator.

Ind. ¶ 20.   *The Indictment does not name any of the Defendants, any of the unindicted co-conspirators or, for that matter, anyone else as the party bearing responsibility for actually faxing the prescriptions.*   The Indictment lacks any specific facts regarding the key element of who, if anyone, "secured and caused to be secured the signatures of conspirator John Gaffney and other doctors on Compounding Pharmacy's pre-printed prescription forms[.]"  Ind. ¶ 18. The Indictment currently identifies all the Defendants "and others."  Mr. Pugh and his co-Defendants are entitled to know the identity of the "others" alleged to have secured the critical signatures that the Indictment repeatedly refers to and relies upon to seek the deprivation of his liberty.

Thus, Rule 7(f) – and the liberalizing amendments thereto – exist precisely to compel disclosure of the information regarding who prepared and submitted the five faxes.  Absent a bill of particulars, as Mr. Pugh prepares for trial and, indeed as he and his counsel defend this matter at trial, they will be utterly unprepared *to meet on the underlying documentary transaction related to the five substantive Counts and the primary overt acts against him.*  No fair reading of the law permits that result.

5.      Medical Terminology That Is Not Defined By Statute Or In The Indictment.

The government seeks to impose criminal liability upon Mr. Pugh based upon an insufficient "medical necessity" for the medications and/or a purported lacking "doctor/patient relationship." Ind. ¶ 18.  From the government's perspective, much hinges on those alleged factual deficiencies.  Neither of those phrases is a statutory term, neither is required by any element of any charged offense, neither is defined by the charged offenses.  _Neither is even defined in the Indictment._  Despite all this, the government expects Mr. Pugh to prepare for trial without knowing the government's basis for its reliance on this phrase, the source of this phrase, how this phrase fits with the charges or, quite frankly, anything else about it.

It is tempting – but incorrect as a matter of fact and law – to interpret "medical necessity" in its most colloquially terms and to simply conclude that, in sum, everyone must know what that means.  With all due respect to the grand jury and the government, this is a criminal case, not a casual conversation.  And, in fact, even the medical community does not agree on what that term means.  Although it is not Mr. Pugh's role in this case to educate the government and, to be sure, a post-indictment "oh yeah, that's what we meant by the term" from the government is insufficient, Mr. Pugh herein seeks to aid the Court regarding the slender and uncertain reed on which the government chose to rest its case.

There is no definition of "medical necessity" applicable to this case.[5]  In fact, different branches of the federal government apply that very same term differently.  The Social Security Act has one definition, "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A), while Medicaid has 50 by relying on the varying definitions promulgated by each of the several states.  _Compare_ N.J.A.C. 10:49-5.1 (no formal state-level medical necessity definition for

---

[5] Even when private parties have defined "medically necessary," federal courts have been called on to determine what the phrase means.  _See, e.g._, _Whitehead v. Federal Express Corp._, 878 F. Supp. 1066 (W.D. Tenn. 1994).

-47-

Medicaid, deferring to clinical judgment and industry best practices) *with* Cal Wel & Inst Code § 14059.5 ("A service is 'medically necessary' or a 'medical necessity' when it is reasonable and necessary to protect life, to prevent significant illness or significant disability, or to alleviate severe pain")*, and* N.Y. Soc. Serv. Law § 365-a ("necessary to prevent, diagnose, correct or cure conditions in the person that cause acute suffering, endanger life, result in illness or infirmity, interfere with such person's capacity for normal activity, or threaten some significant handicap"). Private insurers have their own definitions[6] and, in some cases, a single private insurer may use *multiple definitions simultaneously.* <u>*Cigna is currently using five definitions of "medical necessity" at the same time,*</u> differing depending who is treating the patient, the age of the patient, and what ailment is being treated.[7]

**<u>If the government believes that Mr. Pugh should lose his liberty based upon malfeasance connected to the requirements of "medical necessity" and a "doctor/patient relationship," Rule 7(f) mandates he be told what those terms mean in proceeding.</u>** The law does not leave him to ponder how to meet the government's use of these phrases when, in fact, neither Congress (as scrivener of Title 18), U.S. Attorney's Office (author of the Indictment and evidentiary spigot for the grand jury), nor the grand jury (proponent of the Indictment) has presented him with any definition that he might use to prepare his defense, prepare for motions *in limine*, for cross examination and so on.

---

[6] There is no unified definition of "medical necessity" across insurance carriers, as revealed by a 1994 study by the United States Government Accounting Office.  The study observed that because the six subject insurance carriers interpreted national coverage standards differently, there was substantial variation in denial rates for lack of medical necessity.  U.S. General Accounting Office (U.S. Government Accountability Office), Medicare Part B: Inconsistent Denial Rates for Medical Necessity Across Six Carriers, (Statement of Elanor Chelimsky, assistant comptroller general, before the Subcommittee on Regulation, Business Opportunities, and Technology, March 29, 1994).

[7] Cigna, Coverage Policies: Medical Necessity Definitions (May 5, 2020), https://www.cigna.com/health-care-providers/coverage-and-claims/policies/medical-necessity-definitions.

6.      Other Facts Appropriate For Disclosure Pursuant to Rule 7(f).

Given that the Indictment spans 31-pages, and that it uses "other" approximately 24 times to refer to several groups of people and/or entities, it is not surprising that there are additional facts subject to disclosure under Rule 7(f) and the cases guiding its application.  Mr. Pugh's need for this information is obvious and he will not belabor the Court with continued justifications for why this relief is warranted.  In sum, the Court should order a bill of particulars regarding:

- The "other" doctors.  Ind. ¶¶ 18, 20;

- The "other" individuals who "learned that Pharmacy Benefits Administrator would reimburse thousands of dollars[.]"  Ind. ¶ 5.

- The "other" individuals who sought to enrich themselves by "causing the submission of false" claims, etc.  Ind. ¶ 4.  (It is possible that the list of these "other" people partially or completely overlaps with the list of "other" unindicted co-conspirators.  As demonstrated, throughout this submission, such apparent total overall is not as clear as it may seem at first glance.)[8]

- The "associates" referred to in Paragraph 6.

- The "benefits" referred to in Paragraphs 12, 19.

- The "duties to his employer" that Defendant William Hickman was allegedly "in violation of" as alleged in Paragraph 1.

- The "other insurance plans" referred to in Paragraph 2(b).

- The "elsewhere" this offense is alleged to have taken place.  Ind. ¶¶ 3, 26, 28, 30, 36.

7.      The Unidentified Unindicted Co-Conspirators

The Indictment refers to unnamed unindicted others:

From in or about July 2014 through in or about April 2016, in Atlantic County, in the District of New Jersey, and elsewhere, defendants WILLIAM HICKMAN, SARA HICKMAN, BRIAN

---

[8] The Inconsistent And Impossible To Decipher Use Of "Others."  *See e.g.*, Ind. § 22.

> PUGH, THOMAS SCHALLUS, JOHN SHER, THOMAS SHER, and CHRISTOPHER BROCCOLI did knowingly and intentionally conspire and agree with each other and with John Gaffney, Judd Holt, Michael Sher, Matthew Tedesco, Steven Urbanski, Richard Zappala, **and others** to commit certain offenses.

Ind. ¶ 3 (emphasis added).  Important accusations, facts and actions – all of which Mr. Pugh must be prepared to meet at trial – are attributed to unidentified unindicted co-conspirators throughout the Indictment.  *See* Ind. ¶¶ 4 (allegedly engaging in a scheme to unlawfully enrich themselves); 7 (allegedly recruiting individuals to obtain prescriptions); 8 (allegedly agreeing to recruit individuals); 9 (allegedly receiving payments for recruiting); 18 (allegedly signing prescription forms); 19 (allegedly receiving rewards for signing prescriptions); 23 (allegedly causing Pharmacy Benefit Administrators to pay Compounding Pharmacy).

Mr. Pugh cannot adequately prepare his defense without knowing with whom the government he believes agreed to conspire.  It is hornbook law that for there to be a conspiracy, "there must be a meeting of the minds."  *Startzell v. City of Philadelphia*, 533 F.3d 183, 205 (3d Cir. 2008).  The case law on this issue is clear, the government must disclose the names of these unnamed alleged co-conspirators identified as "others" in the Indictment.  *United States v. Enger*, 472 F. Supp. 490, 511 (D.N.J. 1978) (directing to government to "furnish the names of any co-conspirator not named in the indictment");  *United States v. Mariani*, 90 F. Supp. 2d 574, 592 (M.D. Pa. 2000) (directing the government to file a bill of particulars that provides the names of "others" alleged to be involved in the scheme as otherwise "defendants cannot know with certainty whom the government contends were involved in the fraudulent scheme.");  *United States v. Ahmad,* 53 F.R.D. 194, 199 (M.D. Pa. 1971) ("The government shall furnish the defendants with the names and addresses of all co-conspirators who have come to the knowledge of the government, and if the government shall acquire knowledge of any additional co-conspirators before trial the names and addresses of such co-conspirators shall also be promptly furnished to the defendants.");  *Trie,* 21 F. Supp. 2d at 22 ("[T]he requested disclosure is

necessary to allow [defendant] to adequately prepare for trial and that he is entitled to immediate disclosure of the names [of alleged co-conspirators]. Furthermore, the government is required to provide the names of all alleged co-conspirators regardless of whether they will be called as witnesses at trial."); *United States v. DeGroote*, 122 F.R.D. 131, 137 (W.D.N.Y. 1988) (directing the government to disclose the names of individuals referred to in the indictment as "other individuals both known and unknown to the grand jury"); *Ramirez,* 602 F. Supp. at 793 (government ordered to furnish "[a] statement of the names of other co-conspirators with whom [defendant] allegedly conspired with or dealt with directly"); *United States v. Chovanec,* 467 F. Supp. 41, 46 (S.D.N.Y. 1979) ("the government is directed to furnish the names of those co-schemers known to them and whom they will claim participated in the alleged scheme with defendant"); *United States v. King,* 49 F.R.D. 51, 53 (S.D.N.Y. 1970) ("the Government is directed to furnish the names of any co-conspirators who become known to it prior to trial"); *United States v. Rosenstein,* 303 F. Supp. 210, 213 (S.D.N.Y. 1969) (government directed to "[i]dentify each co-conspirator alleged in the indictment as 'diverse other persons to the Grand Jury unknown,' by name and address, as such conspirators become known to the prosecution").

Given the foregoing, it is essential that the government disclose the names of these alleged "other" co-conspirators for Mr. Pugh's to adequately prepare for trial and know, with certainty, what the government alleges. *See, e.g.*, *Trie,* 21 F. Supp. 2d at 22. To do otherwise would violate Mr. Pugh's fundamental right to be informed "of the nature and cause of the accusation" against him. U.S. Const. amend. VI.

In the present case, the Indictment fails to identify the names of key individuals, including alleged co-conspirators, the locations where certain alleged activities took place, and the specific alleged false/fraudulent representations made by Mr. Pugh and his co-Defendants. The Court should order the Government to produce a bill of particulars to remedy these deficiencies in the Indictment and allow Mr. Pugh to prepare his defense.

## VII.   THE COURT SHOULD SEVER MR. PUGH'S CASE PURSUANT TO RULE 14.

### 1.   Applicable Legal Standard

Pursuant to Federal Rule of Criminal Procedure 14, a severance is warranted if "it appears that a defendant … is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together."   Fed. R. Crim. P. 14. "Prejudice" for purposes of Rule 14 exists "in joint trials when proof inadmissible against a defendant becomes a part of his trial solely due to the presence of co-defendants as to whom its admission is proper."   *United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998) (citing *United States v. Cervone*, 907 F.2d 332, 341-42 (2d Cir. 1990)).   Thus, a severance should be granted when "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539 (1993).  In evaluating whether a severance is required, the "primary consideration is whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants in view of its volume and limited admissibility." *United States v. De Larosa*, 450 F.2d 1057, 1065 (3d Cir. 1971).

### 2.   The Motion Should Be Granted.

The Court should sever Mr. Pugh based upon the danger for spillover prejudice from otherwise inadmissible evidence that cannot be compartmentalized by a jury.   Under similar circumstances, federal courts have granted the relief requested here.   *See, e.g.*, *United States v. Williams*, 181 F. Supp. 2d 267 (S.D.N.Y. 2001) (granting severance because there was "a real risk of spillover prejudice"); *United States v. Brodie*, No. 00-CR-629-4, 2001 WL 849712, at *1 (E.D. Pa. June 19, 2001) (granting severance motion based on danger for spillover prejudice); *United States v. Gomez,* 111 F. Supp. 2d 571 (E.D. Pa. 2000) (granting severance and finding spill-over effect would unduly prejudice movant's defense); *United States v. Cianciulli*, 476 F.

Supp. 845 (E.D. Pa. 1979) (severing case into three separate trials where all defendants were charged with conspiracy, some were additionally charged with aiding and abetting, and another was charged with mail fraud); *United States v. Gaston*, 37 F.R.D. 476 (D.D.C. 1965) (granting severance motion where only two out of ten defendants were charged in all 76 counts of the indictment). *See also United States v. Branker*, 395 F.2d 881 (2d Cir. 1968) (reversing trial court decision and granting separate trials for four of eight defendants, who were named in only a few of the numerous substantive counts, noting that "the trial of the four ... defendants was accompanied by a huge volume of testimony relating not to them but to the manifold criminal activities of" the other defendants and that the prejudice in such cases is "particularly injurious").

In this case, most of the reasoning supporting dismissal is applicable here.  There is simply too much danger for spillover prejudice and jury confusion if Mr. Pugh is tried with Defendants accused of such separate courses of conduct.  Moreover, he is charged in 13 counts, while Mr. Hickman is charged in 46.  Moreover, and with full respect to their innocence, the Hickmans are charged in several schemes in which Mr. Pugh is not.  The timeframe of the Hickman charges are beyond those brought against Mr. Pugh.  The Hickman charges involve companies that and individuals who are not alleged in the Indictment to be part of any charges against Mr. Pugh such as:

1.  Handson Title Agency, Ind. at p. 25 (Counts 44-46);

2.  SWHM Properties, Ind. at p. 25 (Count 43);

3.  LPL Financial, Ind. at p. 25 (Counts 39-41);

4.  MBC Distributions, Ind. at p. 24 (Count 36);

5.  MJP Construction LLC, Ind. at p. 26 (Count 47);

6.  Seterus, Inc., Ind. at p. 26 (Count 48);

7.  KLZ Health and Beauty LLC, Ind. at p. 24 (Count 34);

8.  Judd Holt's wife, Ind. at p. 24 (Count 29);

-53-

9. Steven Urbanski's wife, Ind. at p. 24 (Count 30).

Further, the sheer number and total dollar amount of the financial transactions brought against the Hickmans, as opposed to those against Mr. Pugh, present a significant danger that Mr. Pugh will not receive a trial at which he is judged based upon what the government can – or more likely cannot – prove.  Simply by way of summary, and as a demonstration of just how desperate the government is to lump Mr. Pugh in with others, consider the money laundering conspiracy alleged in Count 28.  The total dollar amount alleged is $5,260,419.42; of that, $403,926.04 is attributed to Mr. Pugh.  The timeframe for this alleged conspiracy is February 2015 through February 2017.  Ind. ¶ 30.  The overt acts for the Count 1 conspiracy, as the Court will recall, are basically within a two-month period in 2015, and the two overt acts attributed to Mr. Pugh in Count 28 are dated December 28, 2015 and April 21, 2016.  Ind. ¶ 34(u) & (v).  Thus, in every way, shape and form, the allegations regarding Count 28 are substantially narrower against Mr. Pugh.

Here, Mr. Pugh should be tried separately because "the jury cannot reasonably be expected to compartmentalize the evidence," *De Larosa*, 450 F.2d at 1065, as it relates to Mr. Pugh and his co-Defendants.  Thus, a joint trial of Mr. Pugh and his co-Defendants will entail the introduction of a vast amount of evidence that is both inadmissible against Mr. Pugh and highly prejudicial to his case.  Indeed, Mr. Pugh's case should be severed because "the quantum of evidence presented [against his co-Defendants] will create a spillover effect in which the jury will infer [his] guilt regardless of the relevance or admissibility of the evidence to his charge." *Brodie,* 2001 WL 849712, at *1.  As in *Brodie* any limiting instructions the Court could give the jury simply cannot remedy the prejudice that Mr. Pugh will suffer if he is tried jointly with the other Defendants.

Under these – and even less prejudicial situations – courts have consistently granted severances based upon the quantum of evidence that will be introduced solely as against co-

defendants. *See, e.g.*, *Brodie*, No. 00-CR-629-4, 2001 U.S. Dist. LEXIS 10533, at *1.  In *Brodie*, for instance, the court held that severance was required because the defendant "would be prejudiced … by the great disparity in the quantum of evidence adduced against him as opposed to that adduced against his co-defendants." *Id.* at *2.  The court explained:

> In presenting its joint case, that is expected to take several weeks, the Government will likely present a substantial quantity of information to the jury, a small portion of which will apply to the charge against Mr. Dolan.  The Court is concerned that <u>the quantum of evidence presented will create a spillover effect in which the jury will infer Mr. Dolan's guilt regardless of the relevance or admissibility of the evidence to his charge</u>.

*Id.* at *2-3 (emphasis added).

\*          \*          \*          \*

In sum, Mr. Pugh's case should be severed because he will be significantly prejudiced by the introduction of evidence that would be inadmissible against him during a separate trial.  This strong likelihood of jury confusion presents a very real risk that the jury will either mistakenly find Mr. Pugh guilty, or improperly infer his guilt.  For all these reasons, the Court should exercise its broad discretion to sever Mr. Pugh from this case.

## VIII.   THE COURT SHOULD ORDER THE PRODUCTION OF A VERY LIMITED PORTION OF THE GRAND JURY TRANSCRIPTS.

### A.   Introduction

If the Court does not dismiss the Indictment, it should order the production of a very limited portion of the grand jury transcripts so that the Court and Mr. Pugh can ensure that he received the protections guaranteed by the Grand Jury Clause of the Fifth Amendment. *United States v. Goldstein*, 502 F.2d 526, 529 (3d Cir. 1974) (grand jury protects individuals from unfounded charges). Specifically, among other things, Mr. Pugh should be afforded the opportunity to ensure that the grand jury was properly instructed. Given the facial error in the Indictment, *e.g.*, that the grand jurors found probable cause to believe that Mr. Pugh aided and abetted himself, it is clear that something went awry in the grand jury room. *Id.* at 529 (reversing denial of motion for judgment of acquittal because it was "obvious from the face of the indictment" that the grand jury had been misinformed). This motion is evaluated under Federal Rule of Criminal Procedure 6. For the reasons set forth, *infra*, this motion should be granted because there is no "reasonable assurance from the face of the indictment that the grand jury found probable cause." *Goldstein*, 502 F.2d at 529.

### B.   The Applicable Legal Standard

Federal Rule of Criminal Procedure 6(e)(3)(E)(ii), states in pertinent part that:

> [t]he court may authorize disclosure -- at a time, in a manner, and subject to any other conditions that it directs -- of a grand jury matter ... at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury ....

The Third Circuit has set forth the standard that a party must meet to establish the grounds for disclosure under Rule 6(e):

> To support a motion for a judicially ordered disclosure of grand jury testimony, a party must show a particularized need for that information which outweighs the public interest in secrecy. [ ] Once such a need is shown, the district court must weigh the competing interests and order so much disclosure as needed for the

ends of justice. [ ] In balancing the competing interests, the district court necessarily is infused with substantial discretion. [ ] This court must analyze a district court's decision to disclose grand jury information only to determine if there was an abuse of that discretion.

*United States v. Coplin*, 156 Fed. Appx. 492, 494 (3d Cir. 2005) (quoting *United States v. McDowell*, 888 F.2d 285, 289 (3d Cir. 1989) (alterations in original)).  *See also Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1421 (11th Cir. 1994)) ("[D]isclosure of grand jury testimony is properly granted where there is a compelling need for such disclosure and such disclosure is required by the ends of justice.");  *In re Grand Jury Mater (Catania)*, 682 F.2d 61, 64 (3d Cir. 1982) (stating that in order to make the required showing, "[t]he seeking party must set forth a 'particularized' need for the desired disclosure") (quoting *United States v. Proctor & Gamble Co.*, 356 U.S. 677, 683 (1958) *United States v. Salko*, No. 1:07-CR-0286, 2008 U.S. Dist. LEXIS 65211, at *46 (M.D. Pa. Aug. 26, 2008) ("Before the Court may authorize disclosure of grand jury testimony …, [the defendant] must show 'a particularized need for that information which outweighs the public interest in secrecy.'") (quoting *McDowell*, 888 F.2d at 289).

Thus, a party may not seek grand jury transcripts based upon pure speculation that there has been prosecutorial misconduct before the grand jury, *United States v. Edelson*, 581 F.2d 1290, 1291 (7th Cir. 1978) (citing *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 400 (1959)), a guess that review of the grand jury minutes might yield a basis for the indictment's dismissal, *United States v. Harbin*, 585 F.2d 904, 907 (8th Cir. 1978) a "bare assertion" that disclosure is "in the interests of justice," *In re Grand Jury Proceedings*, 483 F. Supp. 422, 424 (E.D. Pa. 1979), a desire to prepare for trial, *Powell v. United States*, 352 F.2d 705, 709 (D.C. Cir. 1965); *United States v. Cheatham*, No. 3:2006-29, 2008 U.S. Dist. LEXIS 7697, at *19-20 (W.D. Pa. Feb. 1, 2008); *United States v. Marth*, 42 F.R.D. 432, 433 (S.D.N.Y. 1967) (citing *United States v. Weber*, 197 F.2d 237, 238 (2d Cir. 1952)); *United States v. Gonzales*, 38 F.R.D.

326, 328 (S.D.N.Y. 1965) or an unsupported statement by defense counsel, *United States v. Leonelli*, 428 F. Supp. 880, 883 (S.D.N.Y. 1977). Here, none of these is the case. Rather, as set forth below, there is a particularized need for the limited release of grand jury transcripts.

### C.      The Motion Should Be Granted.

Specifically, this motion should be granted for the following three reasons. <u>First</u>, Mr. Pugh satisfies the Third Circuit's standard because he has articulated a particularized need that outweighs the need for secrecy. *See McDowell*, 888 F.2d at 289. Among other reasons, he is charged under 18 U.S.C. § 2 with aiding and abetting himself, a concept not recognized by the law. Thus, unlike the cases cited above, the request for grand jury transcripts is not based upon speculation or guess-work. *E.g.*, *Edelson*, 581 F.2d at 1291; *Harbin*, 585 F.2d at 907; *Leonelli*, 428 F. Supp. at 883. For some reason, the grand jury indicted Mr. Pugh based upon a legal theory that is not cognizable. Mr. Pugh has established a particularized need for the grand jury transcripts because an analysis of the transcripts is the only means by which to determine why that occurred and, in particular, if it is a result of the fact that the jurors received an improper instruction.

As for the need for secrecy, where "the grand jury's functions are ended, disclosure is wholly proper where the ends of justice require it." *United States v. Socony-Vacuum, Oil Co.*, 310 U.S. 150, 234 (1940). *See also Douglas Oil Co. v. Petrol Stops Northwest*, 441 U.S. 211, 219-20 (1979) ("[I]n some situations justice may demand that discrete portions of transcripts be made available for use in subsequent proceedings."); *Dennis v. United States*, 384 U.S. 855, 869-70 (1966) ("[T]he Court has confirmed the trial court's power … to direct disclosure of grand jury testimony 'preliminarily to or in connection with a judicial proceeding.'"). Further, the grand jury has likely either finished, or may be close to completing its function and, for the reasons set forth above, including the defendant's particularized need, the interests of justice strongly favor disclosure of the relevant portions of the grand jury transcripts.

<u>Second</u>, Mr. Pugh requests a very narrow category of grand jury transcripts, *i.e.*, only that portion of the grand jury transcripts which contain the instructions that the grand jurors received regarding the law.  Those transcripts will not contain any testimony, witness names, or other information that the grand jury secrecy rules are intended to protect.  As the Third Circuit stated in *Camiolo v. State Farm Fire and Cas. Co.*, 334 F.3d 345 (3d Cir. 2003), grand jury secrecy is intended:

> (1) To prevent the escape of those whose indictment may be contemplated; (2) to insure the utmost freedom to the grand jury in its deliberations, and to prevent persons subject to indictment or their friends from importuning the grand jurors; (3) to prevent subornation of perjury or tampering with the witnesses who may testify before [the] grand jury and later appear at the trial of those indicted by it; (4) to encourage free and untrammeled disclosures by persons who have information with respect to the commission of crimes; (5) to protect [an] innocent accused who is exonerated from disclosure of the fact that he has been under investigation, and from the expense of standing trial where there was no probability of guilt.

*Id.* at 355 (citations omitted).  None of those interests would be compromised by the disclosure of the legal instructions given to the grand jurors.

<u>Third</u>, and most fundamentally, this limited release of grand jury transcripts is necessary to ensure that Mr. Pugh received the protections afforded by the Grand Jury Clause of the Fifth Amendment.  At this point, the only certainty is that the grand jury, inexplicably, indicted Mr. Pugh for aiding and abetting himself.  How this could have occurred and how the grand jury could have made the errors that gave rise to this facial invalidly documents in Points I through VI are difficult to understand, and it is wholly inappropriate to guess.  As the Supreme Court has stated,

> To allow the prosecutor, or the court, to make a subsequent guess as to what was in the minds of the grand jury at the time they returned the indictment would deprive the defendant of a basic protection which the guaranty of the intervention of a grand jury

> was designed to secure.  For a defendant could then be convicted
> on the basis of facts not found by, and perhaps not even presented
> to, the grand jury which indicted him.

*Russell*, 369 U.S. at 770.  This motion should be granted, particularly because any guesswork can

be resolved by a review of the legal instructions given to the grand jury.

## IX.   THIS CASE SHOULD BE TRANSFERRED TO THE NEWARK VICINAGE FOR TRIAL DUE TO PREJUDICIAL PRETRIAL PUBLICITY.

### A.   Introduction

This case should be transferred to the Newark vicinage because Mr. Pugh and the other Defendants have been subjected to highly prejudicial coverage by local media outlets.

### B.   The Applicable Legal Standard

The Sixth Amendment to the United States Constitution grants criminal defendants the right to trial by an impartial jury. *Duncan v. Louisiana*, 391 U.S. 145, 153 (1968). A criminal trial ordinarily should take place in the district where the offense was committed. U.S. Const. amend. VI; Fed. R. Crim. P. 18. Due process considerations require transferring the trial to another district if "extraordinary local prejudice" will prevent the defendant from obtaining a fair trial in the district of the offense. *Skilling v. United States*, 130 S. Ct. 2896, 2913 (2010) (citing *In re Murchison*, 349 U.S. 133, 136 (1955)). Under Federal Rule of Criminal Procedure 21(a), the Court may transfer venue if it is satisfied "that so great a prejudice against the defendant exists ... that the defendant cannot obtain a fair and impartial trial" in the transferring district. The Supreme Court identified several factors in *Skilling* relevant to an analysis of presumed prejudice due to pretrial publicity: (1) the size and characteristics of the community in which the crime occurred; (2) the nature of the news stories; (3) the timing of the trial in relation to the alleged crime; and (4) whether the jury acquits the defendant of some of the alleged crimes. *Id.* at 2915-16. The fourth factor is inapplicable when, as here, a defendant moves before trial to change venue.

### C.   The Motion Should Be Granted

#### 1.   The Size And Characteristics Of The Community In Which The Crime Occurred.

It is no stretch to say that the Camden vicinage is dwarfed by the Newark vicinage. As the Court knows, the Camden vicinage is comprised of Atlantic, Burlington, Camden, Cape May,

Cumberland, Gloucester, and Salem counties.  Taken together, the estimated population of those counties in 2019 was 1,811,077.  In contrast, the Newark vicinage is made up of Bergen, Essex, Hudson, Middlesex, Morris, Passaic, Sussex, and Union counties, which combined had an estimated population of 4,919,130 in 2019.  Given the rural nature of several of the counties in the Camden vicinage, it follows that crime reporting in the area is largely dominated by stories regarding alleged criminal activity (often violent criminal activity) in the city of Camden.  In other words, media coverage of the alleged white-collar crimes here was unusual and certainly would stand out in the minds of potential jurors.  The Newark vicinage, however, is home to much of the state's industry and economic engine and, accordingly, the reporting on alleged criminal activity is much more varied.  Given these differences in the vicinages, the case should be transferred to the Newark vicinage so as to ensure that Mr. Pugh obtains a fair trial.

2.      The Nature Of The News Stories

The prejudicial media coverage of this case began on the very day that the Indictment was unsealed.  On the afternoon of Thursday, March 14, 2019, Assistant U.S. Attorney David Walk informed defense counsel that our client had been indicted, that the Indictment was sealed, that an arrest warrant had been issued, but that Mr. Pugh would be permitted to surrender as long as he did so the following morning at the FBI Office in Northfield, New Jersey.  Starting at approximately 7:30 a.m., the Defendants surrendered and were processed at that location.  They were then transported to the federal courthouse in Camden for their first appearances before the Honorable Ann Marie Donio.

At least two news outlets, NBC10 and The Press of Atlantic City, were set up and waiting for the Defendants at the FBI Northfield office by 7:30 a.m., at which time the Indictment was still sealed and would remain so for several more hours.  At this time, the Defendants did not know what their charges were, with whom they had been indicted or any other specific information about the Indictment.  The press informed at least one defense counsel that they had

received a "tip" to be there and that they knew this was about charges for the "compounding case." Despite the fact that every Defendant has known of this investigation and the potential for charges for two years, and notwithstanding that no cooperating Defendant had previously been arrested and cuffed (and there were more than 20), the FBI handcuffed and waist-shackled every Defendant and refused to take them out the back door (which could easily have been done, *see* D369-370). Then, in a planned manner, the FBI took the Defendants on an outdated, prejudicial "perp walk" through the front door of the FBI office and before the assembled media. D276-281 (online), D367-368 (print).

By all appearances, the FBI received the press attention it wanted. The jury pool for this relatively small federal vicinage saw photographs of the Defendants on the Internet almost immediately. The following day, the Press of Atlantic City carried demonstrable evidence of just what the FBI had wrought: its advertisement to prospective jurors of our clients, cuffed, in shackles, and led by FBI agents to a waiting car. D367-368. One could hardly imagine a more inappropriate and guilt-conjuring image. Those images have been used to make a PowerPoint-like video that is now on YouTube, which demonstrates just how much it will continue to prejudice Mr. Pugh. *See* https://youtu.be/6RHX8deCtQQ. And, of course, video of the perp walk, along with commentary that the Defendants were "in handcuffs," figured prominently in the television coverage. *See* https://www.nbcphiladelphia.com/news/national-international/7-new-jersey-residents-charged-in-state-benefits-drug-prescription-scheme/109744/. Even if there was no Rule 6(e) violation, and even if these Defendants had to be cuffed and shackled (neither of which seems likely), there is absolutely no reason for them to be marched out the front door into the waiting arms of the press. This should never have happened. ***(To be clear, we make no accusation against the U.S. Attorney's Office. This is laid at the feet of their agents: the FBI).*** The harm caused by this spectacle continues and was re-emphasized after the next court appearance. Although the Defendants were not even required to appear for this court

appearance, the same inflammatory photos were once again recycled to everyone in the potential jury pool by way of the Press of Atlantic City.  D276-281.

Furthermore, in court for their first appearances (and, again, unlike any of the cooperating and non-cooperating Defendants who pleaded guilty), the Defendants were brought in shackled, in front of their families and the press.  Unlike those who have pled guilty – and who were permitted to enter and depart the courtroom with dignity despite admitting their criminal culpability – the Defendants, all of whom enjoy the presumption of innocence, were treated like flights risks and a danger to society, simply because they have exercised their constitutional rights under the Fifth and Sixth Amendments.

All indictments lead to bad press and, in the age of the Internet, it is more widespread than in years past.  But that truth exacerbates, rather than mitigates, the damage caused.  Whereas initial newspaper coverage of the perp walk may be long gone, the Internet photos, YouTube and news videos of that activity remain, accessible now and forever and as this case proceeds. Indeed, those falsely damning photographs will remain publicly available even when Mr. Pugh is vindicated.  Yet as the June 18, 2019 article from the Press of Atlantic City makes clear, the photographs of the shackled Defendants will be trotted out for each and every court appearance. D371.

The disclosure of the sealed information has negatively impacted the Mr. Pugh's right to "an impartial jury" as guaranteed by the Sixth Amendment.  The Sixth Amendment implications are clear and we will not belabor the point here.  *See, e.g.*, *Rock v. Zimmerman*, 959 F.2d 1237, 1252 (3d Cir. 1992); *see also Foley v. Parker*, 488 F.3d 377, 387 (6th Cir. 2007).  In light of the highly prejudicial media coverage of this case, it should be transferred to the Newark vicinage.

3.       The Timing Of The Trial In Relation To The Alleged Crime

The trial in this matter is currently scheduled to begin on September 21, 2020 but given the Covid-19 crisis, it is unclear whether that date can be considered firm.  Nonetheless, while a

considerable amount of time has elapsed since the alleged underlying conduct, this factor should be given less weight due to the general availability of the prejudicial media articles and photographs regarding this case.  That prejudicial media coverage is available at any time with the click of a button.  For this reason as well, this matter should be transferred to the Newark vicinage.

*       *       *       *

For all the foregoing reasons, the Motion should be granted and the case should be transferred to the Newark vicinage for trial.

## X.   <u>**CONCLUSION**</u>

For the foregoing reasons, the Court should dismiss the Indictment or grant other appropriate relief.

Respectfully,

**BALDASSARE & MARA, LLC**

*Attorneys for Defendant Brian Pugh*

By: *<u>/s/ Michael A. Baldassare</u>*
Michael A. Baldassare

By:*<u>/s/ Jennifer Mara</u>*
Jennifer Mara

By:*<u>/s/ Charles Kennedy</u>*
Charles Kennedy

Dated:  May 11, 2020